T.C. Memo. 1996-303

UNITED STATES TAX COURT

PMT, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4458-94.                          Filed July 2, 1996.

<u>Mitchell R. Miller</u>, for petitioner.[1]

---

[1]  After the trial of this case in Los Angeles, Cal., on Mar. 22, 23, and 24, 1995, was concluded, petitioner on June 14, 1995, filed a petition in the U.S. Bankruptcy Court for the Central District of California.  This Court was notified of the filing of the petition in bankruptcy and was furnished a certified copy of the petition on June 28, 1995.

On June 29, 1995, we issued an order staying all proceedings in this case.

On Oct. 31, 1995, respondent filed a status report in this case, to which was attached a certified copy of an order of the U.S. Bankruptcy Court for the Central District of California, dated Oct. 20, 1995, in which the bankruptcy court stated that the automatic stay is terminated for the purpose of allowing the
(continued...)

Donna F. Herbert, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax in the amount of $426,707, and an accuracy-related penalty under section 6662(a)[2] in the amount of $85,341 for petitioner's taxable year ended July 31, 1990. Some

---

[1](...continued)
U.S. Tax Court to continue its proceedings involving the debtor in the bankruptcy case, and allowing the IRS to assess any tax liability determined by the U.S. Tax Court in the case before it.

On Nov. 6, 1995, this Court issued an order that the stay of proceedings in this case was lifted and allowed petitioner to and including Dec. 20, 1995, within which to file a brief in this case. In a further order dated Nov. 22, 1995, granting Mitchell R. Miller's motion to withdraw as counsel for petitioner, which order was served on petitioner, the Court specifically stated that petitioner was not relieved of the obligation of filing a brief in this case by Dec. 20, 1995, because of withdrawal of its counsel.

No brief was received by the Court as required by order of the Court. By order dated Mar. 18, 1996, we granted petitioner to and including Apr. 15, 1996, to file a reply to respondent's brief filed June 21, 1995 (which had been served on petitioner Jan. 16, 1996), and stated that if no brief were received from petitioner on or before Apr. 15, 1996, the Court would proceed with consideration of this case. The Court has received no brief from petitioner, and, therefore, it has been necessary to determine the issues in this case without a statement of petitioner's position with respect to the evidence in the case or petitioner's position with respect to respondent's requested findings of fact and arguments in her brief.

[2] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision: (1) The proper amount to be allowed as a deduction to petitioner for reasonable compensation of officers; (2) to what extent, if any, the amount allowable to petitioner as a deduction for officers' compensation for the year at issue should be allocated to mixed service costs and capitalized pursuant to section 263A; and (3) whether petitioner is liable for an accuracy-related penalty under section 6662(a) for the year at issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner's principal place of business at the time of the filing of the petition in this case was Vernon, California. During the year at issue, petitioner was engaged in the business of converting yarn to fabric. PST, Inc. (PST), was the predecessor company to petitioner and was formed by Patti Penalba (Mrs. Penalba) and Marcos Penalba (Mr. Penalba). PST was a textile converting operation, which is an operation that purchases raw textile materials, known as gray goods, commissions out the materials to operators that produce the fabric, and then has the fabric finished at dye houses, after which the fabric is sold to clothing manufacturers.

Petitioner was incorporated in 1984. Mr. and Mrs. Penalba were married prior to and during the year at issue, but had been

divorced prior to the trial of this case. Each of the Penalbas held 50 percent of petitioner's stock during the years 1988 through 1990. The initial investment of the Penalbas in petitioner's stock was a total of approximately $15,000. When petitioner first began its operations, its conversion was all done through commissioned knitting, dyeing, and finishing plants. After 1987, petitioner stopped selling woven fabrics and started selling only knitted fabrics. In 1990, petitioner was involved in some resales of both gray goods and finished goods.

Mrs. Penalba was the chief financial officer and secretary of petitioner during its fiscal years 1987 through 1990, and Mr. Penalba was its president during those years. Petitioner hired a bookkeeper in 1985. Sometime after the bookkeeper was hired, petitioner hired a receptionist who was trained in production. In 1987 or 1988, petitioner began to hire outside salespeople.

Petitioner designed its own fabrics, and most of the fabrics it sold to customers were of petitioner's own designs. Both Mr. or Mrs. Penalba would discuss development of a fabric which was being designed, but Mr. Penalba actually designed the fabric. Mr. Penalba would determine such aspects of the fabric as the type of thread to be used, the construction needed for the fabric, whether the fabric needed stretchability on the width or length, or whether the fabric was to be top or bottom weighted. Mr. Penalba was responsible for selecting the proper yarns, the proper equipment, the knitting weights, and the work requirements

for production efficiency in the manufacture of the fabric. Mr. Penalba shared the responsibility for ensuring that the manufacture of the fabric was cost efficient. Since petitioner was a converter that contracted out its operations, selecting efficient and capable factories to produce the fabrics was essential to petitioner's success. Mr. Penalba was responsible for selecting the fabrics to be contracted out to the various manufacturers of its fabrics.

Jorge Rubino (Mr. Rubino) began working for petitioner in 1989 as its production manager. Mr. Rubino's duties as production manager included purchasing yarn, taking the orders to the knitting plants, controlling the production of the fabrics, and delivering the fabrics to the finishing plants to be finished. Mr. Penalba supervised and worked directly with Mr. Rubino.

Mr. Penalba's duties as the top person in charge of production included deciding which fabric designs petitioner would produce. Mr. Penalba's duties included researching and developing fabrics, meeting with customers in designing fabrics, and negotiating with the commissioned knitting and dyeing plants. Mr. Penalba held meetings with the production staff at least once a week. Mr. Penalba worked very closely with Mr. Rubino.

Mr. Penalba was also responsible for petitioner's sales operation. Mr. Penalba would recruit and train salespeople to work with petitioner's customers. As petitioner's sales manager,

Mr. Penalba's duties included supervising the sales staff, meeting with both salespeople and purchasers, and handling product service.

Mr. Penalba frequently worked 15 to 18 hours a day, and Mr. Penalba often worked weekends. Mr. Penalba worked approximately 80 to 100 hours per week during the year at issue. Mr. Penalba's duties and responsibilities did not change dramatically from year to year.

Mrs. Penalba was responsible for the daily operations of petitioner. Mrs. Penalba secured credit to finance material purchases and operations. Mrs. Penalba was also responsible for recordkeeping and customer services. Mrs. Penalba was responsible for confirming orders and seeing that purchase orders were properly filled. In general, Mrs. Penalba was second in authority in making policy decisions for petitioner, including decisions with respect to production.

Although Mrs. Penalba's workload increased steadily from 1985 through 1991, the nature of her duties remained substantially the same. Mrs. Penalba worked approximately 60 to 80 hours per week during the year at issue.

In 1987, Mr. Penalba developed several fabrics that became very desirable in the industry. The most popular fabric that Mr. Penalba developed was a cotton fabric with a Spandex polyurethane or Lycra synthetic filament (the cotton/Lycra fabric). The cotton/Lycra fabric was desirable because it gave an elastic

quality to the cotton fabric, which cotton did not have naturally. Mr. Penalba developed the cotton/Lycra fabric by wrapping the synthetic filament completely around the cotton fibers. The cotton/Lycra fabric was used by clothing manufacturers for such products as athletic jerseys, leotards, dresses, bicycling shorts, ski shorts, and leggings. Sales for the cotton/Lycra fabric caused petitioner's gross receipts for its fiscal year 1990 to increase dramatically.

The cause of petitioner's decrease in sales after 1990 was primarily market conditions. After its fiscal year 1990, other operators became able to manufacture fabrics similar to the cotton/Lycra fabric, causing increased competition for petitioner in this product.

On its Federal income tax returns for its years ending July 31, 1987 through July 31, 1990, petitioner reported the following gross receipts:

| Year ending July 31 | Gross receipts |
| --- | --- |
| 1987 | $9,244,122 |
| 1988 | 7,764,587 |
| 1989 | 11,514,777 |
| 1990 | 22,203,363 |

On its Federal income tax returns for its years ending July 31, 1987 through July 31, 1990, petitioner reported the following taxable income:

| Year ending July 31 | Taxable income |
|---------------------|----------------|
| 1987 | $193,594 |
| 1988 | 109,261 |
| 1989 | 134,120 |
| 1990 | 823,886 |

After its fiscal year 1990, petitioner became an S corporation, and thereafter for each year filed a Form 1120S, U.S. Income Tax Return for an S Corporation.  On its Federal income tax returns for its taxable years 1990 (short year of August 1, 1990 through December 31, 1990), 1991, and 1992, petitioner reported gross receipts and ordinary income as follows:

| Year | Gross receipts | Ordinary income |
|------|----------------|-----------------|
| 1990 | $7,643,457 | $61,223 |
| 1991 | 16,664,152 | 525,687 |
| 1992 | 11,493,635 | 173,169 |

Petitioner paid no dividends from the date of its inception to the time of the trial in this case.  Petitioner's return on equity for its fiscal years 1988 through 1990 and calendar years 1990 through 1992, computed by using as net income after taxes amounts computed from petitioner's Federal income tax returns and dividing that amount by shareholder equity at the beginning of the year, is as follows:

| Tax year ended | Formula | Return on equity |
|----------------|---------|------------------|
| July 31, 1988 | $\dfrac{\$83,399}{\$210,654}$ | 40% |

| | | |
|---|---|---|
| July 31, 1989 | 98,563 | |
| | 277,762 | 35 |
| July 31, 1990 | 543,765 | |
| | 361,229 | 150 |
| Dec. 31, 1990[1] | 61,223[2] | |
| | 682,819 | 9 |
| Dec. 31, 1991 | 525,687[2] | |
| | 1,241,915 | 42 |
| Dec. 31, 1992 | 173,169[2] | |
| | 1,736,516 | 10 |

[1]  The year ended Dec. 31, 1990, was a short taxable year.

[2]  For these years, the ordinary income figures that were reported on the Forms 1120S were used, since no tax was paid by the corporation.

On its Federal income tax returns for its years ending July 31, 1987 through July 31, 1990, petitioner deducted officers' compensation as follows:

| Year ending July 31 | Mr. Penalba's compensation | Mrs. Penalba's compensation | Total compensation |
|---|---|---|---|
| 1987 | $296,500 | $296,500 | $593,000 |
| 1988 | 220,000 | 105,000 | 325,000 |
| 1989 | 445,000 | 215,000 | 660,000 |
| 1990 | 1,342,400 | 407,600 | 1,750,000 |

For its fiscal year 1990, petitioner adopted an incentive bonus plan (the bonus plan), under which petitioner's officers were to be paid an incentive bonus equal to 10 percent of the gross increase in petitioner's sales for its fiscal year 1990

over its gross sales for its fiscal year 1989. The bonus plan

provided as follows:

> RESOLVED FURTHER, that the Board of Directors have evaluated various incentive compensation programs and have determined that the most appropriate method for determining and measuring the performance and contribution of its officers to this Corporation during a fiscal year is through the application of a fixed formula which calculates the incentive amount by multiplying a fixed percentage times the net * * * increase in gross sales volume of the Corporation for its current fiscal year over the immediately preceding fiscal year.

> RESOLVED FURTHER, that the Board of Directors of the Corporation have determined that the standard percentage within the industry in which the Corporation engages is ten percent (10%) and that this amount represents a fair incentive. As such, the Corporation shall make available for distribution to its officers a gross bonus pool amount equal to ten percent (10%) of the gross increase in sales of this Corporation for its fiscal year ending July 31, 1990 over its gross sales for its fiscal year ending July 31, 1989.

> RESOLVED FURTHER, that the gross bonus amount available for distribution shall be distributed to its officers not later than ninety (90) days following the close of its fiscal year. Each officer shall be entitled to receive a distribution from the bonus pool in an amount which equals the ratio of an officer's annual compensation (without regard to the bonus) to all officers' compensation multiplied against the gross bonus pool.

Isaac Blumberg (Mr. Blumberg) was the outside accountant for

petitioner during the year at issue and for some years prior and

subsequent thereto. Mr. Blumberg performed a number of services

for petitioner during the year at issue, including preparing

financial statements, consulting on tax issues, and performing

other tax work. Mr. Blumberg also participated in designing the

bonus plan for the fiscal year 1990 for petitioner. For the

calendar years 1989 and 1990, petitioner paid Mr. Blumberg fees for his services in the amounts of $68,553.50 and $89,594.59, respectively.

The bonus plan was not offered to employees other than Mr. and Mrs. Penalba.  The bonus plan was terminated in March 1991, because it was no longer needed after petitioner became an S corporation.

For its fiscal year 1990, petitioner's production personnel earned the following compensation:

| Employee | Title | Salary |
|---|---|---|
| Mr. Rubino | Converting supervisor-<br>yarn purchasing | $58,175 |
| Elena Cabrera | Production supervisor-<br>dyeing and finishing<br>coordinator | 26,000 |
| Gonzalo Campos | Production clerk-<br>knitting | 18,900 |
| Juan Isidro | Production clerk-<br>yarn | 14,880 |
| Beverly Dominguez | Production clerk-<br>data entry | 15,715 |

In addition to the above listed compensation, Mr. Rubino received a company car and health insurance benefits for himself and his family.

Mr. Blumberg also prepared a pension plan for petitioner's employees sometime before the fiscal year at issue (the employee pension plan).  The plan was funded for approximately 2 years and covered five employees.  At the request of some of the employees covered by the plan, the employee pension plan was terminated in 1990.

Mr. and Mrs. Penalba, along with Mike Macias (Mr. Macias), owned a knitting plant, U.S. Fabrics Corp. (U.S. Fabrics), in 1990. Mr. and Mrs. Penalba together owned 65 percent of U.S. Fabric. U.S. Fabrics was an S corporation during 1990. Approximately 40 to 50 percent of U.S. Fabrics' business was production for petitioner. Mrs. Penalba was involved in setting up U.S. Fabrics in 1990, and provided some management to U.S. Fabrics in that year. Mrs. Penalba spent approximately 5 percent of her time working for U.S. Fabrics. Mr. Penalba met with Mr. Macias at least 2 to 3 times per week and sometimes once a day. Mrs. Penalba earned $79,938 from U.S. Fabrics during the calendar year 1990, and Mr. Penalba earned $79,939 from U.S. Fabrics during that year. U.S. Fabrics had its offices in the same building as petitioner.

Long Beach Dyeing and Finishing (Long Beach) was a dyeing and finishing plant owned by the Penalbas, with Rodolfo Saldias (Mr. Saldias), who was a salesman for petitioner.

The Penalbas owned the building in which petitioner and U.S. Fabrics had offices, and the Penalbas leased building space to these companies. Petitioner paid $129,775 in rent to the Penalbas during the calendar year 1990. The Penalbas, along with Mr. Blumberg, determined a fair rental for petitioner to pay the Penalbas.

Petitioner paid sales commissions of $578,947 during its fiscal year 1990. The rate of commission that petitioner paid

its salespeople was between 1.5 and 4 percent of sales. In 1990, the top salesperson for petitioner was Mr. Saldias, who earned $337,182.59 in commissions for the calendar year 1990.

On July 31, 1990, Mr. Penalba loaned $689,454.42 to petitioner, and Mrs. Penalba loaned $172,363.61 to petitioner. Petitioner's income tax return for its fiscal year 1990 shows that at the beginning of the year its loans from stockholders were $822,941 and at the end of the year were $1,233,246. Mrs. Penalba loaned substantial sums of money to petitioner over the years in order to establish more working capital to enable petitioner to receive further credit from suppliers and vendors.

On its income tax return for its fiscal year 1990, petitioner claimed a deduction for compensation paid to Mr. Penalba of $1,342,400 and for compensation paid to Mrs. Penalba of $407,600. Respondent in her notice of deficiency determined that reasonable compensation for petitioner's officers during its fiscal year 1990 was $875,000 and disallowed as a deduction $875,000 of the $1,750,000 claimed by petitioner on its income tax return for officers' compensation for that year. Respondent determined that reasonable compensation for Mr. Penalba for petitioner's fiscal year 1990 was $671,200 and that reasonable compensation for Mrs. Penalba was $203,800. Respondent also determined that petitioner's closing inventory for its fiscal year 1990 was undervalued by $379,819. At the trial, counsel for respondent explained that part of the undervaluing of inventory

was due to an increase in inventory value because of capitalizing a portion of officers' compensation for petitioner's fiscal year 1990. Respondent further determined that petitioner was liable for an accuracy-related penalty pursuant to section 6662(a).

OPINION

Section 162(a)(1) provides for the deduction of all the ordinary and necessary expenses paid or incurred in the carrying on of a trade or business, including a reasonable allowance for compensation for personal services actually rendered. Whether the compensation is reasonable compensation is a question of fact. Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992). Some of the factors to be considered in determining the reasonableness of compensation of an employee are: (1) The employee's role in the company; (2) a comparison of the employee's salary with salaries paid by similar companies for similar services; (3) the character and condition of the company; (4) whether the relationship between the employee and the company is such as to permit the company to disguise nondeductible corporate distributions of profits as deductible compensation; and (5) the internal inconsistency of a company's treatment of payments to employees. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245-1247 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282.

The employee's role in the company requires a consideration of the position held by the employee, the number of hours worked

by the employee, the duties that the employee performed, and the general importance of the employee to the success of the company. American Foundry v. Commissioner, 536 F.2d 289, 291-292 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972).

It is clear from the testimony in this case that both Mr. and Mrs. Penalba worked long hours for petitioner. The evidence indicates that Mr. Penalba frequently worked 15- to 18-hour days, while Mrs. Penalba worked 60 to 80 hours per week. It is also evident that petitioner would not have been in existence, or have continued in existence, without the efforts of employees or officers comparable to the Penalbas. The Penalbas were both extremely dedicated to their work.

Respondent contends that the dramatic increase in gross receipts was not solely caused by the efforts of the Penalbas, but rather the fashion trends that had a great impact on petitioner's business in 1990. Respondent argues that the increase in sales was, for the most part, a fortuitous circumstance.

We find that the dramatic increase in sales in 1990, while partly due to fortuitous market circumstances, was due primarily to the insight of Mr. Penalba in seeing the need for a cotton/Lycra fabric and developing such a material. Mr. Penalba saw the need in the manufacture of leggings and other garments of an expandable fabric and developed such a fabric before petitioner's competitors had such a fabric available. This to an

appreciable extent caused the increase in petitioner's sales in 1990. Such a fabric was desirable, not simply because of fortuitous fashion trends, but because such a fabric was useful in a wide variety of garments.

Respondent makes the argument that the large amount of commissions paid by petitioner to its salespeople in 1990 creates an inference that the efforts of the salespeople had a direct influence on the increase in gross receipts that year. However, the evidence indicates that petitioner's salesmen received no greater percentage commission that year than in previous years. Therefore, this evidence does not indicate that the efforts of the salespeople were entirely responsible for the dramatic increase in sales. The evidence indicates that the sales staff earned large commissions at least in part because of the desirability of the product petitioner produced during the year at issue.

The second factor listed above is salaries paid by similar companies for similar services. Each party offered testimony of an expert with respect to this factor.

Respondent's witness, E. James Brennan III (Mr. Brennan), the president of a personnel and pay practice consulting firm, testified that the salaries of the Penalbas were unreasonable. He relied on information from other firms the same size in sales as petitioner. Mr. Brennan concluded that the CEO function should be used to compare to Mr. Penalba's salary, while the top

financial executive should be used to compare with Mrs. Penalba's salary. Mr. Brennan described the CEO as "the highest paid position found among survey data", while the top financial executive was the officer "responsible for the organization's overall financial plans and policies, along with its accounting activities and the conduct of its relationship with lending institutions, shareholders, and the financial community".

Mr. Brennan's calculations were based primarily on data from the Executive Compensation Service (ECS). Mr. Brennan's report stated that the total compensation figures were based on the highest amounts from the non-manufacturing and wholesale categories, and included both salary and bonus amounts. If the survey for non-manufacturing companies yielded a higher pay amount than the survey for the wholesale industry, Mr. Brennan used the higher number. Mr. Brennan determined what the average compensation for each job was from the ECS survey and then took two standard deviations to arrive at his highest maximum amounts.

We find no evidence that Mr. Brennan's conclusions are based on companies comparable to petitioner. Mr. Brennan's figures, taken from ECS statistics, are based on broad, general categories of industries, and not on businesses that are similar to the business of petitioner in this case. Mr. Brennan based his calculations on the wholesale industry and used the ECS statistics for companies with a Standard Industrial Classification (SIC) code for a trader in "nondurables, apparel,

piece goods, and notions".  However, Mr. Brennan testified that he was unable to state the industry petitioner was in, and was unsure whether petitioner was, in fact, in either the wholesale or the non-manufacturing industry.  Mr. Brennan stated that he had little, if any, knowledge of petitioner's operations, and that there was no evidence that his statistics included any other converting operations comparable to petitioner's.  In fact, petitioner in this case was not a wholesale operation, but rather a manufacturing operation with its work contracted out to other companies.  Petitioner produced knitted fabric for garment manufacturers, and was not included in the SIC code that Mr. Brennan relied on, which specifically excluded knitted goods operations.  Petitioner was properly included in the SIC code for manufacturers.  The statistics that Mr. Brennan used from the Conference Board data, another survey he relied on in his report, are based on companies, all of which had annual sales of at least $60 million, while petitioner had sales of approximately $22 million in the year here in issue.  The median average company in the ECS survey had sales of $1.7 billion, while only four companies in the survey had sales of less than $199 million.

Even though Mr. Brennan categorized Mr. Penalba as the chief executive officer and Mrs. Penalba as the top financial executive, he had no information as to what duties each of the Penalbas actually performed for petitioner.  From the job descriptions in Mr. Brennan's report, it is clear that Mr.

Brennan's comparables are based on occupations for much larger companies that have more specialized officers. The Penalbas' duties were not accurately described by Mr. Brennan's descriptions of chief executive officer and top financial executive. In effect, Mr. Brennan's statistics merely determined who were the highest paid individuals for the wholesale trade industry for the top executive officer and the top financial officer nationwide without regard to the particular aspects of petitioner's industry. We find no evidence that Mr. Brennan's report includes any businesses comparable to petitioner.

Petitioner had two witnesses testify as to reasonable compensation for the Penalbas. Edward Dubner (Mr. Dubner) testified on behalf of petitioner with regard to the Penalbas' compensation. Mr. Dubner was a credit manager for two factoring companies during 1989 and 1990, that did business with petitioner. In the garment industry, a factoring company purchases receivables or lends money against those receivables. A factor's interest in reviewing officers' compensation is to determine if the business is capable of functioning on a day-to-day basis and paying its bills on time. In August 1990, Mr. Blumberg consulted with Mr. Dubner about the amount petitioner was proposing to pay as officers' compensation. Mr. Dubner did not object to the 1990 compensation because the Penalbas loaned back a substantial portion of their 1990 compensation to petitioner, and subordinated those loans to the loans of other

creditors.  Mr. Dubner's interest was not in the reasonableness of salaries paid to officers, but rather the capital of the company.  Mr. Dubner's testimony, therefore, is of little, if any, value on the issue of reasonable compensation.  His interest was solely whether the 1990 officers' compensation paid by petitioner would adversely affect petitioner's ability to pay its bills.

Petitioner's accountant, Mr. Blumberg, was called as a witness by petitioner to testify as to the reasonableness of the Penalbas' compensation.  The Court ruled that consideration of Mr. Blumberg's testimony would be limited to the financial data he had prepared.  Mr. Blumberg utilized the Robert Morris Associates 1990 Annual Statement Studies (RMA).  The RMA is heavily relied on by credit managers and officers at banks, factors, and trade creditors.  The RMA lists comparables by their Standard Industrial Classification (SIC) code.  Mr. Blumberg utilized the SIC code 2257, which includes operations that are "establishments primarily engaged in knitting weft (circular) fabrics or in dyeing, or finishing weft (circular) knit fabrics." This definition includes converting operations.  Mr. Blumberg determined that it was inappropriate to classify petitioner as an apparel maker, fabric producer, or distributor, because these operations produce woven fabrics that are rarely produced in the U.S. and are generally produced on a much greater scale than knit fabrics.  In comparison with woven fabric operations, operations

that manufacture knitted fabric require less capital investment, yet the personal vision and talent of management is more important. Mr. Blumberg concluded that the knit goods industry is dominated by small-scale entrepreneurs who are successful if they are able to anticipate fashion trends and quickly produce goods to meet emerging demands.

In comparison with the data provided by the RMA, Mr. Blumberg determined that petitioner had greater gross profit, return on owner's equity based on profit before taxes (by a factor of 1,300 percent), and return on total assets (by a factor of 562 percent) than the RMA reported data.

Mr. Blumberg also provided two comparables from clients from his accounting practice in the southern California area. However, when Mr. Blumberg refused to supply the names or any information about the business of these clients, the Court stated that this evidence would not be considered, since respondent had no way of verifying the data. Mr. Blumberg had few qualifications as an expert on reasonable salaries. Mr. Blumberg has had a close association with petitioner for a number of years. Mr. Blumberg served as petitioner's accountant during the year at issue and for a number of other years. While Mr. Blumberg had a few college courses that dealt with reasonable salaries for corporate officers, he had no history of recognized expertise in compensation matters.

The RMA study that Mr. Blumberg relied on was a collection from lending institutions that came from bank and creditor loan records. It was not designed to be used as a survey of compensation. An important weakness of the RMA study is that it supplies the amount of total officers' compensation, but does not supply information regarding the number of officers or their duties.

The testimony of none of the witnesses in this case offered as experts is helpful in resolving the issue of the reasonableness of salaries paid by petitioner.

While the record contains some evidence of the character and condition of petitioner during the year here in issue, there is little in the record to show the complexities of petitioner's business as compared to other companies. There is evidence that in the year here in issue petitioner's sales and profits increased dramatically, but that this situation did not carry over to later years.

Finally, it is clear that petitioner's sole shareholders were in a position to determine the amount of their compensation without reference to the amount which would be paid for similar work in an arm's-length transaction. See Spicer Accounting, Inc. v. United States, 918 F.2d 90, 92 (9th Cir. 1990); Nor-Cal Adjusters v. Commissioner, 503 F.2d 359 (9th Cir. 1974), affg. T.C. Memo. 1971-200.

Petitioner never paid dividends from the date of its inception through the years at issue. Mr. Blumberg testified that petitioner did not pay dividends because petitioner was a growth company. According to Mr. Blumberg, growth companies generally do not pay dividends because they are not attempting to strengthen their stock values or attract new stockholders but rather growth companies are desirous of retaining capital. In Elliotts, Inc. v. Commissioner, 716 F.2d at 1247, the Court of Appeals stated:

> If the bulk of the corporation's earnings are being paid out in the form of compensation, so that the corporate profits, after payment of the compensation, do not represent a reasonable return on the shareholder's equity in the corporation, then an independent shareholder would probably not approve of the compensation arrangement. If, however, that is not the case and the company's earnings on equity remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. [Fn. ref. omitted.]

Petitioner's return on equity, calculated as net income after taxes per petitioner's Federal income tax returns, divided by shareholder equity at the beginning of the year, was 150 percent for the year at issue, while for the 2 previous fiscal years, petitioner's return on equity was 45 and 50 percent, respectively. Respondent does not dispute that the return on equity for 1990 was "excellent", but argues that the return on equity from the taxable year ended July 31, 1988, to the taxable year ended December 31, 1992, was not as impressive. While the

return on equity for years not at issue in this case is less relevant than the return on equity for the year that is before us, the evidence in the record indicates that except for the short taxable year 1990, where the return on equity would be skewed in favor of a low return, the return on equity for the years shortly after the year at issue were very good as well. We find that petitioner maintained a high return on equity. However, petitioner's capital also included borrowed capital. This borrowed capital was from loans made to petitioner by the Penalbas, apparently from the large salaries they were paid. In this situation, the return on equity is of limited importance.

Also, the high return on equity does not mean that an unrelated stockholder would be willing to have nearly twice the amount paid by petitioner as officers' salaries as its remaining total income, if equally competent officers were available for more reasonable amounts of compensation.

One factor to be considered is whether the compensation at issue was paid pursuant to a structured, formal, and consistently applied program.

The record indicates that the bonuses paid to the Penalbas were not based on the bonus plan entered for its fiscal year 1990. Since petitioner did not file a brief in this case, we are not privy to its position on this issue. Petitioner's accountant testified that the bonuses that petitioner paid to the Penalbas complied with the terms of the bonus plan. This is contradictory

to the direct terms of the bonus plan. The bonus plan provided that the officers were to be paid a bonus equal to 10 percent of the gross increase in sales of petitioner for the fiscal year 1990 over its gross sales for its fiscal year 1989. Under the bonus plan, the total bonuses paid to all officers from the bonus pool would have been $1,068,858. The bonus plan clearly provided that the bonuses were to be paid in an amount equal to the ratio of an officer's annual compensation to that of all officers applied to the gross bonus pool. The record is unclear as to the amount the Penalbas received in base salary for petitioner's fiscal year 1990. However, the evidence indicates that the Penalbas' base salaries were approximately equal if not identical. Mrs. Penalba testified that her salary, which was the same as Mr. Penalba's for the year here in issue, was approximately $125,000. Mr. Blumberg implied that the Penalbas' base compensation in petitioner's fiscal year 1990 was $682,000. Since under the bonus plan Mr. and Mrs. Penalba were to have been paid in the same proportion as their base salary, we conclude that the bonuses paid for the year at issue were not paid pursuant to a structured, formal, and consistently applied program. Also, the total amount of the bonuses appears to have been improperly computed.

Respondent contends that neither Mr. nor Mrs. Penalba needed an incentive to work harder since they owned the business. Both Mr. and Mrs. Penalba testified that they gave their full efforts

to the business, and that they did not need an incentive plan to perform well.

Mr. Penalba testified that he assisted in development of the plan and thought that it was adequate to maintain the performance of the company. Mr. Penalba did not know how it was calculated, nor did he know the specifics of the plan. Based on the record in this case, it is clear that the plan was not the major incentive for the work output of either Mr. or Mrs. Penalba during the year at issue.

It is also clear from the record that petitioner paid its other employees at least on par with, if not slightly better than, other companies in the industry. Mr. Rubino, the production manager for petitioner during the year at issue, and a salesman for petitioner at the time of trial, and the only employee of petitioner other than the Penalbas to testify in this case, received a salary of $58,175, along with a company car, certain other bonuses, and health care for his family. Mr. Rubino testified that he was better paid than others at the same level in the industry. The record also indicates that petitioner paid its salesmen, who served as either independent contractors or employees, well, during the year at issue. The only evidence as to the compensation of the other employees of petitioner is their respective salaries. Petitioner did not provide a pension plan for its employees during the year at issue, but the evidence indicates that it was other employees of petitioner and not the

Penalbas who requested that the pension plan be terminated, because the employees desired control over how to invest the proceeds. Although petitioner paid its employees other than the Penalbas well, the divergence in their pay and the pay of the Penalbas is striking. Petitioner's highest paid salesman earned $337,182.59 in petitioner's fiscal year 1990, as compared to $1,342,400 paid to Mr. Penalba. It should also be noted that each of the Penalbas devoted some time to another corporation in which they were stockholders and were compensated for that work as employees.

Based on all of these factors, we conclude that, although there has been no showing that the compensation allowed by respondent for Mr. Penalba is not reasonable for Mr. Penalba's normal duties as petitioner's CEO, Mr. Penalba, in addition, is entitled to substantial compensation during the year at issue for his development of the cotton/Lycra fabric that was largely responsible for petitioner's increased sales in that year.

Respondent argues on brief that it is not appropriate to determine a reasonable salary for Mr. Penalba's services to petitioner by separately considering all the various "jobs" he did and determining a reasonable amount for each. However, this Court and other courts have in numerous cases considered the reasonableness of compensation based on the fact that the recipient performed more than one function for his employer, even though it may not be the sum of the amounts which would be paid

to a full-time employee in each such position that determines a reasonable salary for one employee performing many functions.

Mr. Penalba's duties as production manager and sales manager were comparable to the CEO position in other operations. We find no information in this record as to companies comparable to petitioner, and, based on this record, hold a reasonable salary for Mr. Penalba as petitioner's CEO is $671,200 as determined in the notice of deficiency. This amount is comparable to the maximum amounts paid to CEOs of other companies for which statistics are in this record. We consider the $671,200 as reasonable compensation for Mr. Penalba, solely for his work as CEO of petitioner in its fiscal year 1990.

This record shows that Mr. Penalba, in addition to being petitioner's CEO, was also the developer of the process for manufacturing the cotton/Lycra fabric, which development was responsible in large part for petitioner's increase in sales for the year here in issue. In our view, in an arm's-length arrangement, Mr. Penalba would have been compensated for his work in the development of the cotton/Lycra fabric with a percent of the sales of the cotton/Lycra fabric, in addition to his compensation as petitioner's CEO.

Since the sales of cotton/Lycra fabric are not shown separately in the record, we shall assume that the increase in petitioner's sales in its fiscal year 1990, over its fiscal year 1989, were due primarily to sales of cotton/Lycra fabric. There

is nothing in this record to show directly the percent of sales of the cotton/Lycra fabric that Mr. Penalba would have received in an arm's-length transaction because he was the developer of the fabric. However, some of petitioner's salesmen were paid a commission of 4 percent for their selling activities. Based on this fact, we conclude that in an arm's-length transaction petitioner would have paid Mr. Penalba approximately 4 percent of the sales of cotton/Lycra fabric in its fiscal year 1990, and hold that this amount would be $400,000. We, therefore, hold that total reasonable compensation to Mr. Penalba by petitioner in its fiscal year 1990 is $1,071,200.

The record shows that Mrs. Penalba worked 60 to 80 hours a week, but does not show any other extraordinary contribution she made to petitioner. In fact, from her testimony it appears that she was not knowledgeable with respect to some of petitioner's activities about which a chief financial officer would be expected to be knowledgeable. There is nothing in this record to indicate that reasonable compensation for Mrs. Penalba would be in excess of the amount determined by respondent, except the testimony of respondent's expert witness that reasonable compensation for Mrs. Penalba was $209,520 for petitioner's fiscal year 1990. For reasons heretofore stated, we do not accept the opinion of respondent's expert because of its being based on noncomparable data. However, we shall accept the $209,520 as reasonable compensation for Mrs. Penalba's services

to petitioner in petitioner's fiscal year 1990, as in effect a concession by respondent of this amount, which is a little over $6,000 in excess of the amount determined by respondent in the notice of deficiency.

The next issue is to what extent, if any, the officers' compensation paid by petitioner for its fiscal year 1990 should be allocated to mixed service costs and capitalized pursuant to section 263A. Although the deficiency notice merely determined an increase in petitioner's ending inventory, respondent at trial explained that this was due in part to capitalization under section 263A of officers' salaries paid for production activities.[3]

---

[3] In Hamilton Indus., Inc. v. Commissioner, 97 T.C. 120, 143 n.10 (1991), which involved an inventory valuation issue, we pointed out that:

> For tax years beginning after Dec. 31, 1986, the full absorption rules were replaced by the uniform capitalization rules of sec. 263A, added to the Code by The Tax Reform Act of 1986, supra, which expanded the types of indirect costs required to be treated as inventory costs. See S. Rept. 99-313, 1986-3 C.B. (Vol. 3) 1, 133-152.

Section 263A[4] generally requires the capitalization of

---

[4]  SEC. 263A.  CAPITALIZATION AND INCLUSION OF INVENTORY
                COSTS OF CERTAIN EXPENSES.

    (a) Nondeductibility of Certain Direct and Indirect
        Costs.--

        (1)  In general.--In the case of any property to
which this section applies, any costs described in paragraph
(2)--

            (A)  in the case of property which is inventory in the hands of the taxpayer, shall be included in inventory costs, and

        (B)  in the case of any other property, shall
    be capitalized.

        (2)  Allocable costs.--The costs described in this
    paragraph with respect to any property are--

        (A) the direct costs of such property, and

        (B) such property's proper share of those
    indirect costs (including taxes) part or all of which
    are allocable to such property.

    Any cost which (but for this subsection) could not be
    taken into account in computing taxable income for any
    taxable year shall not be treated as a cost described
    in this paragraph.

direct and indirect costs (including taxes) properly allocable to real and tangible property produced by a taxpayer. "Produced property" includes both property that is sold to customers (inventory) and property that is used in a taxpayer's trade or business (self-constructed assets). Sec. 263A(g)(1). Section 1.263A-1T(b), Temporary Income Tax Regs., 52 Fed. Reg. 10061-10062 (Mar. 30, 1987), provides that direct material and labor costs must be capitalized with respect to production activities. Further, all indirect costs that directly benefit or are incurred by reason of the performance of a production activity must be capitalized. Sec. 1.263A-1T(b)(2)(ii), Temporary Income Tax Regs., 52 Fed. Reg. 10062 (Mar. 30, 1987). Property produced for the taxpayer under a contract with another is treated as property produced by the taxpayer to the extent that the taxpayer makes payments or otherwise incurs costs with respect to such property. Sec. 1.263A-1T(a)(5)(ii), Temporary Income Tax Regs., 52 Fed. Reg. 10061 (Mar. 30, 1987).

"Direct material costs" include the cost of those materials that become an integral part of the subject matter and the cost of those materials that are consumed in the ordinary course of the activity. "Direct labor costs" include the cost of labor which can be identified or associated with a particular activity. Sec. 1.263A-1T(b)(2), Temporary Income Tax Regs., 52 Fed. Reg. 10062 (Mar. 30, 1987). "Indirect costs" include those costs that directly benefit or are incurred by reason of the performance of

a production activity.  Sec. 1.263A-1T(b)(2)(ii), Temporary Income Tax Regs., 52 Fed. Reg. 10062 (Mar. 30, 1987). Compensation paid to officers attributable to services performed in connection with particular production activities is an example of an indirect cost that must be capitalized.  Sec. 1.263A-1T(b)(2)(iii)(N), Temporary Income Tax Regs., 52 Fed. Reg. 10062 (Mar. 30, 1987).  Marketing, selling, advertising, and distribution expenses, including compensation of officers attributable to services performed in connection with the cost of selling, are not required to be capitalized under section 263A. Sec. 1.263A-1T(b)(2)(iii)(N), supra; sec. 1.263A-1T(b)(2)(v)(A), Temporary Income Tax Regs., 52 Fed. Reg. 10066 (Mar. 30, 1987).

The record is unclear as to Mrs. Penalba's role in the production aspect of petitioner's operations.  However, under section 263A(g) development of a product is included in the definition of production.  Mrs. Penalba testified that both she and Mr. Penalba were involved in purchasing raw materials for petitioner.  Mrs. Penalba also testified that she worked a great deal with Mr. Penalba in product development.  This testimony was somewhat inconsistent with the testimony of Mr. Rubino, petitioner's production manager during the year at issue, who testified that he did not work with Mrs. Penalba in production, and that her role in the company was strictly dealing with finances.  While Mrs. Penalba may have had authority over

production in Mr. Penalba's absence, she was seldom involved in the day-to-day production operations.

It is clear from the record that Mr. Penalba was very involved in production, and that production was vital to petitioner's business. Mr. Penalba was responsible for both production and sales of the fabric. Mr. Penalba not only developed the fabrics petitioner produced, but also supervised the production of the fabrics from the factories with which petitioner had contracts. While Mr. Penalba was intimately involved in production, he was also responsible for sales, including recruiting and training salesmen, customer service, and frequently meeting with customers and the salesmen.

Respondent has submitted that 75 percent of Mr. Penalba's compensation is subject to the capitalization requirement of section 263A, while 50 percent of Mrs. Penalba's compensation is subject to section 263A. It appears from the record that Mr. Penalba's compensation was due substantially to his production services for petitioner. We have concluded that $400,000 was reasonable compensation to Mr. Penalba in petitioner's fiscal year 1990 for development of the cotton/Lycra fabric, which is part of production. Sec. 263A(g)(1). Certainly, petitioner has not shown that the compensation of Mr. Penalba was not primarily for his production duties. We hold that 75 percent of Mr. Penalba's compensation was for his production duties.

Based on the record, we find that the amount of Mrs. Penalba's compensation attributable to production was de minimis. We, therefore, conclude that 75 percent of the amount of reasonable compensation we have determined for Mr. Penalba is subject to the provisions of section 263A, but that none of Mrs. Penalba's compensation is subject to the provisions of section 263A.

The final issue is whether petitioner is liable for an accuracy-related penalty pursuant to section 6662(a). Section 6662(a) imposes an accuracy-related penalty of 20 percent on any portion of an underpayment of tax which is attributable to items set forth in section 6662(b). Respondent contends that either negligence or substantial understatement of tax applies in the instant case under section 6662(b)(1) and (2).

Negligence includes any careless, reckless, or intentional disregard of rules and regulations, any failure to make a reasonable attempt to comply with the provisions of the law, and any failure to exercise ordinary and reasonable care in the preparation of a tax return. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Section 6662(b)(2) specifies as one of those items "Any substantial understatement of income tax". An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or, for a corporation, $10,000.

Section 6662(d)(2)(B) states that the amount of the understatement shall be reduced by the portion of the understatement which is attributable to the tax treatment of any item if there is or was substantial authority for such treatment or if the relevant facts affecting the item's tax treatment are adequately disclosed on the return or in a statement attached to the return and there is a reasonable basis for the tax treatment of such item.  To determine whether the treatment of any portion of an understatement is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions.  Antonides v. Commissioner, 91 T.C. 686, 702-703 (1988), affd. 893 F.2d 656 (4th Cir. 1990).

Section 6664(c)(1) provides that the penalty should not be imposed on any portion of an underpayment if the taxpayer shows reasonable cause for such portion of the underpayment and that the taxpayer acted in good faith with respect to such portion. Reliance on the advice of a professional, such as an accountant, may constitute a showing of reasonable cause if, under all the circumstances, such reliance is reasonable and the taxpayer acted in good faith.  Sec. 1.6661-6(b), Income Tax Regs.

We hold that petitioner acted with reasonable cause.  Mr. and Mrs. Penalba relied on the advice of their accountant, Mr. Blumberg, both in determining the salaries for the year at issue and establishing the bonus plan.  Mr. Blumberg was under the

impression that the salaries conformed with the bonus plan, as evidenced by his testimony in this case. Petitioner, undoubtedly, reasonably relied on Mr. Blumberg's advice when it determined the appropriate compensation for the Penalbas, and, therefore, acted with reasonable cause and with good faith.

<u>Decision will be entered under Rule 155</u>.