**LABELGRAPHICS, INC.,**
**Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL**
**REVENUE, Respondent–**
**Appellee.**

**No. 99–70164.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 2000

Filed Aug. 8, 2000

Gersham Goldstein (argued) and Charles F. Adams, Stoel Rives, Portland, Oregon, for the petitioner-appellant.

A. Wray Muoio (argued) and Gilbert S. Rothenberg, Tax Division, U.S. Department of Justice, Washington, D.C., for the respondent-appellee.

Before: LAY,[1] TASHIMA, and McKEOWN, Circuit Judges.

## OPINION

McKEOWN, Circuit Judge:

This case stems from a bonus-characterized by the taxpayer itself as "unusually high"-paid to the president of a closely held, single-shareholder corporation. The taxpayer, LabelGraphics, Inc., ("LabelGraphics") appeals the Tax Court's decision that only $406,000 of the $878,913 paid to its president, Lon D. Martin ("Martin"), in fiscal year 1990, was reasonable compensation and therefore deductible as an ordinary and necessary business expense. We must determine whether the Tax Court appropriately applied the five-factor test established in *Elliotts, Inc. v. Commissioner*, 716 F.2d 1241, 1245 (9th Cir. 1983), for determining the reasonableness of employee compensation. Because the Tax Court did not commit clear error in applying the *Elliotts* test, we affirm.

## BACKGROUND

LabelGraphics is an Oregon corporation that produces pressure-sensitive identification materials such as product labels and graphic overlays. The company specializes in sales to electronics and high-technology companies, but also offers retail typesetting services.

Martin, LabelGraphics's president, started the company as a sole proprietorship in 1978 and incorporated it in 1980. During the tax year in question (fiscal year ending June 30, 1990), Martin was the corporation's sole shareholder. Two years later Martin sold all of his shares to his son.

Despite its relatively small size, LabelGraphics has been very successful and has enjoyed a strong reputation as an innovator in the industry. During the company's first eight fiscal years (1981–88), its annual gross receipts increased significantly each year. Receipts declined slightly over the next two years, but this was expected due to market conditions. Fiscal year 1990 was the first year that the company sustained a net loss after taxes. Specifically, the company had a negative return on equity for that year (6.19%), although its cumulative return on equity was still impressive (36.05%).

During 1989 and 1990, LabelGraphics developed its Micro Clean 100 proprietary process ("MC 100 process") for producing labels meeting the "clean room" production facility standards of its electronics industry customers. Martin played a leading role in the substantial research and development that led to the creation of the MC 100 process. With this process, LabelGraphics became the first company to produce contaminant-free labels. By June 1990, the company's directors anticipated that the MC 100 process would be highly successful and their prediction ultimately proved to be correct.

At that time, LabelGraphics employed 58 people. The board of directors consisted of Martin, Joan Martin (Martin's wife), and Jerry Crispe. Joan Martin and Crispe were also LabelGraphics's other two officers (secretary and executive vice president, respectively). Neither had substantial experience in the label and printing industry before working for LabelGraphics. Martin's son, Mike, also worked for the company.

In short, Martin was the "heart" of this company. During 1990, his duties included: (1) setting corporate policy; (2) establishing and monitoring quality control and authorizing resources to ensure compliance; (3) maintaining external relationships; (4) directing the investment of funds; (5) directing employee policies; (6) establishing mission statements; (7) coordinating relationships with competitors, suppliers, and consultants to establish cor-

---

**1.** The Honorable Donald P. Lay, Senior United States Circuit Judge for the United States Court of Appeals, Eighth Circuit, sitting by designation.

porate goals; (8) chairing all board meetings; (9) approving departmental strategy; and (10) reviewing and approving all capital expenditures. From 1988 to 1990, Martin also devoted some of his time to an unrelated printing venture in Puerto Rico.

Martin's compensation consisted of a salary and bonus. He received no stock options or royalties. In contrast to the board-adopted formulas for determining the bonuses of Crispe and Mike Martin, the company had no fixed formula for determining Martin's bonus; rather, the directors generally considered the company's performance over the past year.

For fiscal year 1990, the year the MC 100 process was developed, Martin's salary was $156,000 and he received a bonus of $722,913, a figure that was substantially higher than all previous bonuses:

| Year | Salary | Bonus | Total Compensation |
|------|--------|-------|--------------------|
| 1985 | $154,000 | $150,000 | $304,000 |
| 1986 | 156,600 | 125,000 | 281,600 |
| 1987 | 156,600 | 125,000 | 281,600 |
| 1988 | 185,000 | 250,000 | 435,000 |
| 1989 | 158,200 | 200,000 | 358,200 |
| 1990 | 156,000 | 722,913 | 878,913 |
| 1991 | 156,000 | — | 156,000 |

In this regard, the board minutes reflected a

[b]onus to Lon D. Martin. Once again, the corporation has enjoyed a successful and profitable fiscal year. The Directors recognize that this success continues to be due in large part to the efforts and expertise of President, Lon D. Martin. In light of this recognition and the fact that Mr. Martin's base salary has been continued at the same level for several years, the Directors unanimously agreed to pay Mr. Martin a total bonus of $722,913.00. This bonus is to be paid by the corporation's forgiving a debt of $82,566.00 due from Mr. Martin to the corporation and by paying the balance of $640,347.00 in cash to Mr. Martin.

Also, for the first time, the board paid a bonus to Joan Martin and paid an additional bonus (in excess of the formula) to Mike Martin. LabelGraphics deducted these bonuses on its FY 1990 corporate tax return as reasonable compensation for services rendered.

The Commissioner sent a deficiency notice to LabelGraphics that, in pertinent part, disallowed $633,313 of Martin's total compensation as a deductible reasonable business expense. On appeal, the Tax Court found that the Commissioner correctly determined that the full amount was not reasonable compensation, but that the Commissioner overstated the excess. Accordingly, the court held that LabelGraphics was entitled to a $406,000 deduction ($156,000 as salary and $250,000 as a bonus) as reasonable compensation to Martin. *Labelgraphics, Inc. v. Commissioner*, 76 T.C.M. (CCH) 518, 1998 WL 668645 (1998). In concluding that Martin was entitled to a bonus greater than that suggested by the Commissioner, the court explained that the corporation's minor downswing in 1990 was expected and not attributable to Martin; that, in fact, despite the decline, "Martin still had done an excellent job in managing petitioner"; that Martin was "entitled to some bonus for his efforts in successfully developing" the MC 100 process; and that $406,000 of compensation would result in a revised return on equity (approximately 10.20%) that would satisfy an independent investor. *Id.* at 528–29. LabelGraphics timely appealed the Tax Court's decision.

## STANDARD OF REVIEW

■ This case turns on the standard of review applicable to the Tax Court's decision. Although we review de novo the Tax Court's definition of the factors for determining the reasonableness of compensation, *Elliotts*, 716 F.2d at 1245, here the Tax Court appropriately delineated the *Elliotts* factors. As such, the real issue is the Tax Court's application of those factors to the case at hand, which we review for clear error. *See id.* ("The Tax Court's findings of fact, derived from application of the appropriate factors, must be affirmed unless clearly erroneous."); *see also Pacific Grains, Inc. v. Commissioner*, 399 F.2d

603, 605 (9th Cir.1968) ("What constitutes reasonable compensation to a corporate officer is a fact question which must be determined in light of all of the evidence."). We affirm because we are not "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

## DISCUSSION

This case presents the classic tension between characterization of payments as employee compensation, which is deductible, and characterization of payments as a dividend,[2] which is not deductible. As we noted in *Elliotts,*

> [i]t is likely to be in the interests of both the corporation and the shareholder-employee to characterize any payments to the shareholder-employee as compensation rather than dividends. For this reason, a taxpayer's characterization of such payments may warrant close scrutiny to ensure that a portion of the purported compensation payments is not a disguised dividend.

716 F.2d at 1243.

The question here is whether the Tax Court clearly erred in finding that $406,000 of Martin's 1990 salary and bonus was reasonable, deductible compensation and excluding the remaining $472,913 of his bonus. We hold that the Tax Court's finding was not clearly erroneous.

█ Under section 162(a)(1) of the Internal Revenue Code, a corporation may deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered." I.R.C. § 162(a)(1). "When payments are made to an individual who is both a corporate employee and a principal shareholder, a two-prong test is applied to determine whether the distribution is truly compensatory. First, the amount of compensation must be reasonable; second, the payment must be purely for services, or have a purely compensatory purpose." *O.S.C. & Assocs., Inc. v. Commissioner*, 187 F.3d 1116, 1119–20 (9th Cir.1999) (citing *Elliotts*, 716 F.2d at 1243), *cert. denied*, — U.S. —, 120 S.Ct. 1831, 146 L.Ed.2d 775 (2000); *see also* Treas. Reg. § 1.162–7(a). The second prong of the inquiry is rarely invoked, *see Elliotts*, 716 F.2d at 1244 ("By and large, the inquiry under section 162(a)(1) has turned on whether the amounts of the purported compensation payments were reasonable."), and is not at issue here. The burden is on the taxpayer to prove the merit of the deduction. *Nor–Cal Adjusters v. Commissioner*, 503 F.2d 359, 361 (9th Cir.1974).

█ In *Elliotts*, we set out five broad factors that are relevant to the reasonableness inquiry: (1) the employee's role in the company; (2) a comparison of the employee's salary with those paid by similar companies for similar services; (3) the character and condition of the company; (4) potential conflicts of interest; and (5) evidence of an internal inconsistency in a company's treatment of payments to employees. 716 F.2d at 1245–47. No single factor is decisive. *Id.* at 1245. When conducting the reasonableness inquiry, "it is helpful to consider the matter from the perspective of a hypothetical independent investor. A relevant inquiry is whether an inactive, independent investor would be willing to compensate the employee as he was compensated." *Id.*

During the relevant time period, Martin was the sole shareholder of LabelGraphics. This makes the compensation/dividend determination especially difficult. As explained in *Elliotts*, "[n]ot only is a sole shareholder likely to have complete control over the corporation's operations, he will also be the only recipient of its dividends." 716 F.2d at 1243. Nevertheless, "[d]espite the difficulties of determining what is reasonable compensation, it is the obligation of the Tax Court to spell out its reasoning

2. Notably, from its incorporation through January 1, 1992, the company paid no formal dividends.

and to do more than enumerate the factors and leap to a figure intermediate between petitioner's and the Commissioner's." *Leonard Pipeline Contractors, Ltd. v. Commissioner,* 142 F.3d 1133, 1135 (9th Cir.1998).

We turn now to the Tax Court's application of the *Elliotts* factors.

### 1. The employee's role in the company

■ When looking at this factor, "[r]elevant considerations include the position held by the employee, hours worked, and duties performed, as well as the general importance of the employee to the success of the company. If the employee has received a large salary increase, comparing past duties and salary with current responsibilities and compensation also may provide significant insights into the reasonableness of the compensation scheme." *Elliotts,* 716 F.2d at 1245 (citations omitted).

■ The Tax Court recognized Martin's pivotal position in the corporation. Martin played multiple management roles ranging from plant design to marketing.[3] He was instrumental in the development of the MicroClean 100 process. The court concluded, however, that Martin's role as the "driving force" in the company did not weigh in favor of a bonus almost three times greater than previous bonuses.[4] Indeed, the Tax Court found that except for the earliest years (1980 and 1981), Martin was very well compensated. Prior to the striking spike in 1990, Martin's total compensation between 1984 and 1989 ranged between $281,600 and $435,000. The year following the 1990 bonus, which LabelGraphics itself characterized as "unusually high" and an "extraordinary one time" bonus, Martin was paid $156,000 in salary and no bonus:

| Year | Total Compensation |
|------|--------------------|
| 1984 | $352,200 |
| 1985 | 304,000 |
| 1986 | 281,600 |
| 1987 | 281,600 |
| 1988 | 435,000 |
| 1989 | 358,200 |
| 1990 | 878,913 |
| 1991 | 156,000 |

As illustrated above, 1990 was truly "off the charts."

One rationale often advanced for an extraordinary increase in compensation is that the compensation "makes up" for past undercompensation. This remedy, it is argued, is a factor to be considered in the reasonableness of compensation. Here, however, no evidence suggested that the compensation package was intended to remedy prior undercompensation or that Martin had taken on any additional roles or duties in 1989 or 1990. LabelGraphics correctly maintains that prior undercompensation is not the sine qua non of a significant increase in compensation. The Tax Court did not, however, treat it as such. Rather, the court properly recognized that when relevant, an intention to remedy prior undercompensation can weigh in favor of reasonableness. This is not such a case and the Tax Court gave little weight to the conclusory claim of undercompensation offered by Martin's expert because no analysis or explanation supported the claim.[5] Finally, the Tax

---

**3.** LabelGraphics's expert testified that "[i]t's not uncommon to see a combination of VP of sales and marketing. It's very uncommon to see the breadth and skill set both strategically and tactically that we identified in the case of Lon Martin. He basically has been able to keep a very lean organization at the executive level in place over a sustained period of time."

**4.** This conclusion was well-founded. As the *Fifth Circuit* explained in a case involving two executives who filled a variety of roles and who were directly responsible for the "remarkable growth and profitability" of their companies, "limits to reasonable compensation exist even for the most valuable employees." *Owensby & Kritikos, Inc. v. Commissioner,* 819 F.2d 1315, 1325 (5th Cir.1987).

**5.** Because this case does not turn on the need to remedy prior undercompensation, LabelGraphics's heavy reliance on the Sixth Circuit's decision in *Alpha Medical, Inc. v. Commissioner,* 172 F.3d 942, 952 (6th Cir.1999) (holding that compensation in excess of $4 million "did not exceed the amount needed to remedy prior years of undercompensation, and was therefore reasonable"), is misplaced.

Court noted that "any possible earlier undercompensation by petitioner of Mr. Martin was likely remedied long before 1990." *Labelgraphics,* 76 T.C.M. (CCH) at 526.

Neither the Board's minutes nor any other evidence indicates that the uncharacteristically large bonus was directly tied to the development of the MC 100 process (which at that point had yet to prove successful). Although a closely held corporation's failure to document actions is neither uncommon nor generally looked upon disfavorably, *see Levenson and Klein, Inc. v. Commissioner,* 67 T.C. 694, 713–14, 1977 WL 3679 (1977), it is nevertheless the taxpayer's burden to demonstrate reasonableness, and LabelGraphics must show a connection between the bonus and the MC 100 process development. LabelGraphics's expert did testify that her investigation revealed that the executives in 1990 had high expectations regarding the MC 100 process, but "high hopes" does not provide a nexus strong enough to overcome the clear error standard. The Tax Court's application of this factor was not clearly erroneous.

**6.** The Tax Court rejected LabelGraphics's argument that the compensation was reasonable in part because Martin did not receive any stock options. As the court explained, "[m]oreover, even if he were not petitioner's sole shareholder, we are skeptical that Mr. Martin, prior to and during the 1990 fiscal year, in addition to the salary and bonus he had already received, would also have been compensated by petitioner with stock options.... Mr. Martin generally does not appear to have been undercompensated in prior years. Also, we have no way of knowing the specific stock options petitioner's experts believed Mr. Martin, hypothetically, should have otherwise received, as they provided no further elaboration in connection with this point." *Labelgraphics,* 76 T.C.M. (CCH) AT 526.

We recognize the role that options have come to play in executive compensation, especially in the high technology sector. *See* Randall S. Thomas and Kenneth J. Martin, *The Determinants of Shareholder Voting On Stock Option Plans,* 35 WAKE FOREST L. REV. 31, 34–35 (2000); Calvin H. Johnson, *Stock Compensation: The Most Expensive Way to*

### 2. A comparison of the employee's salary with those paid by similar companies for similar services

"It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." Treas. Reg. § 1.162–7(b)(3). The Tax Court was well within its authority as fact-finder in giving little weight to LabelGraphics's two experts regarding the comparable companies factor. *See Alpha Medical, Inc.,* 172 F.3d at 950 (Tax Court did not err in rejecting expert's opinion regarding comparisons); *Owensby & Kritikos, Inc. v. Commissioner,* 819 F.2d 1315, 1331 (5th Cir.1987). LabelGraphics's experts (Jones and ·Culbertson) testified that Martin's total compensation was reasonable, based in part on the fact that Martin received neither stock options [6] nor royalties,[7] two forms of compensation that the experts contended are often used by comparable companies. As the Tax Court explained, however, these experts offered no details on which to base a comparison and failed to show a meaningful connection between LabelGraphics and the companies that they claimed were comparable.[8] A review of the experts' re-

*Pay Future Cash,* 52 S.M.U. L. REV. 423, 424 (1999); *see also Kennedy v. Commissioner,* 671 F.2d 167, 175 (6th Cir.1982) ("High compensation is more reasonable when there is a corresponding lack of fringe benefits such as pension plans or stock options which might normally be expected."). Nevertheless, the Tax Court did not clearly err in concluding that LabelGraphics failed to produce sufficient comparative evidence on this issue.

**7.** We also recognize that in certain circumstances royalties are an appropriate form of executive compensation. *See PMT, Inc. v. Commissioner,* 72 T.C.M. (CCH) 5 (1996) (finding that CEO would have been compensated in the form of percentage of sales for his role in development of new product in addition to his compensation as CEO). The lack of any meaningful evidence on this point distinguishes LabelGraphics's case.

**8.** Specifically, the Tax Court found that:

Culbertson and Jones failed to offer any details concerning the specific high-technology companies upon which they based their

ports and their testimony supports this conclusion.[9]

■ LabelGraphics maintains that there is a "dearth of comparable companies" and that this presents a question of first impression in this Circuit, namely how to apply this factor in such a situation. We hold that, to the extent this factor favors neither party, it is treated as neutral. *See Alpha Medical, Inc.,* 172 F.3d at 950 (agreeing with Tax Court that this factor favored neither party and therefore was neutral); *Shaffstall Corp. v. United States,* 639 F.Supp. 1041, 1047 (S.D.Ind.1986) ("Absent comparative data, the Court must look at the qualifications and responsibilities of the employee and the actual services performed.") (citing *Petro–Chem Marketing Co. v. United States,* 221 Ct.Cl. 211, 602 F.2d 959, 963 (1979)). Moreover, to the extent LabelGraphics argues that there is a dearth of companies for comparison, it directly undermines its experts' claims that such companies exist and are comparable. The problem LabelGraphics faced before the Tax Court was not a lack of comparable companies but a lack of any evidentiary detail regarding the claimed comparable companies.

Finally, the Tax Court also found that "[a]lthough Mr. Martin may have performed some of the duties and functions of four ... executives, he did not perform work equal to the full-time services of four such executives." *Labelgraphics,* 76 T.C.M. (CCH) at 526. We agree. *Cf. Elliotts,* 716 F.2d at 1246 ("If Elliott was performing the work of three people, the relevant comparison would be the com-

bined salaries of those three people at another dealer."). Even if Martin did perform the duties of four executives, there is no evidence that Martin assumed additional roles in fiscal year 1990 such that a threefold increase in bonus was merited. *See Rutter v. Commissioner,* 853 F.2d 1267, 1272 (5th Cir.1988) (finding no evidence that scope of employees' work changed in years in question); *see also Exacto Spring Corp. v. Commissioner,* 196 F.3d 833, 836 (7th Cir.1999) ("Although the more roles or functions an employee performs the more valuable his services are likely to be, an employee who performs four jobs, each on a part-time basis, is not necessarily worth as much to a company as four employees each working full time at one of those jobs.") (citation omitted). In sum, the Tax Court did not commit clear error in applying this factor.

### 3. The character and condition of the company

"The focus under this category may be on the company's size as indicated by its sales, net income, or capital value. Also relevant are the complexities of the business and general economic conditions." *Elliotts,* 716 F.2d at 1246 (citation omitted). The Tax Court found that "from its inception through the 1990 fiscal year, petitioner has been an extremely well managed and profitable company." *Labelgraphics,* 76 T.C.M. (CCH) at 527. Understandably, LabelGraphics does not assert any error related to this factor.

---

opinions. They also offered no specifics on the particular executives involved, nor pertinent information on their particular qualifications and skills and the exact compensation they received. We thus are unable to determine: (1) How similar these other unidentified companies and their businesses are to petitioner; and (2) how similar the services their executives rendered are to the services Mr. Martin performed. *Labelgraphics,* 76 T.C.M. (CCH) at 526.

**9.** The Tax Court also declined to accept the opinion of the Commissioner's expert (Clausen), explaining that he used companies that were not reasonably comparable to Label-

Graphics and failed to take into account stock options granted to the chief executive officers of two of those companies. Contrary to LabelGraphics's assertion, the Tax Court's recognition that Clausen failed to look at stock options does not reflect an internal inconsistency in its treatment of stock options. The court simply concluded that: (1) there was not sufficient evidence that Martin would have received options, and (2) when comparing Martin's compensation with that of other CEOs who did receive options, the options must be considered as part of the compensation packages being used for comparison.

### 4. Potential conflicts of interest

*Elliotts* instructs that

[t]he primary issue within this category is whether some relationship exists between the taxpaying company and its employee which might permit the company to disguise nondeductible corporate distributions of income as salary expenditures deductible under section 162(a)(1). Such a potentially exploitable relationship may exist where ... the employee is the taxpaying company's sole or controlling shareholder....

716 F.2d at 1246 (citations omitted).

Because Martin was the sole shareholder, "the sort of relationship existed that warrants scrutiny.... In such a situation ... it is appropriate to evaluate the compensation payments from the perspective of a hypothetical independent shareholder." *Id.* at 1246–47. Considering that LabelGraphics suffered a net loss of $98,639 in fiscal year 1990, resulting in a negative return on equity of 6.19%, the Tax Court concluded that an independent investor would not be satisfied with the bonus paid to Martin. The court rejected the argument that such an investor would be satisfied because the company still boasted a cumulative return on equity of 36.05%.[10]

Pointing to a footnote in *Elliotts*, LabelGraphics argues that a negative return on equity for the year in question should not always be accorded so much weight: "It should be noted that there are situations in which the compensation paid to employees is reasonable and yet the corporation may suffer a loss or an inadequate return on equity." *Elliotts,* 716 F.2d at 1247 n. 5. This, according to LabelGraphics, is such a situation.

But this statement in *Elliotts* is merely dicta and simply underscores the fact-specific nature of the reasonableness inquiry. Construed in context, the focus in this portion of the *Elliotts* opinion was on the Tax Court's failure to *consider* the rate of return on equity during the years that the challenged compensation was paid. *See* 716 F.2d at 1247 ("The Tax Court failed to consider the significance of this data.... The Tax Court erred by limiting its analysis in this area to the facts that Elliott was Taxpayer's sole shareholder and Taxpayer paid no dividends."). In contrast, the Tax Court here considered both the return on equity for fiscal year 1990 and the cumulative return on equity and came to the conclusion that an independent investor would be more concerned about the former. The Tax Court noted that the higher cumulative equity figure was skewed by the much higher returns enjoyed in the earlier years when the corporation's equity was much lower. (For example, the 88.5% return on $43,482 equity during the first year of operation is not particularly meaningful to a present investor judging return on equity in excess of $1 million.) LabelGraphics has failed to provide meaningful support for its contention that this conclusion was clearly erroneous.[11] Nor has the company provided support for its contention that, under the circumstances here, the Tax Court's measurement of rate of return based solely on book value, rather

---

**10.** LabelGraphics also points out the success that it has enjoyed since 1990, due in large part to the MC 100 process. The Tax Court did recognize this later success: "In years after 1990 and 1991, the labels were probably the single most important factor in spurring petitioner to even greater sales and profitability." *Labelgraphics,* 76 T.C.M. (CCH) at 527.

**11.** *Cf. Donald Palmer Co. v. Commissioner,* 69 T.C.M. (CCH) 1869, 1873 (1995) ("[W]here,

as here, the compensation resulted in negative retained earnings and a negative return on shareholder equity ... we cannot conclude that an independent investor would be pleased. Based on these negative returns, it is reasonable to conclude that funds are being siphoned out of the company disguised as salary.") (citation and internal quotations omitted).

than by considering the market value of the company, was clearly erroneous.

### 5. *Evidence of an internal inconsistency in a company's treatment of payments to employees*

*Elliotts* cautions that "[b]onuses that have not been awarded under a structured, formal, consistently applied program generally are suspect.... Similarly, salaries paid to controlling shareholders are open to question if, when compared to salaries paid to non-owner management, they indicate that the level of compensation is a function of ownership, not corporate management responsibility." 716 F.2d at 1247 (citations omitted).[12] "It is permissible to pay and deduct compensation for services performed in prior years." *Id.* at 1248.

The Tax Court found that Martin's 1990 bonus "represented a departure from [Taxpayer's] normal annual bonus practice," *Labelgraphics*, 76 T.C.M. (CCH) at 528, which was to tie his bonus in large part to the company's performance during the recent fiscal year. LabelGraphics does not challenge this finding; rather, it contends that the departure was justified because of the development of the clean room labels. The court rejected the assertion that the full bonus of $722,913 was justified because of Martin's involvement in the MC 100 process development, as "petitioner's later financial success with the new labels was by no means certain as of the end of the 1990 fiscal year." *Id.* The Tax Court was not clearly erroneous in finding that this factor weighed against LabelGraphics because of the deviation in treatment of the president's bonus. Judging the size of the bonus against the uncer-

tainties of the clean room venture, the Tax Court concluded that an independent investor would not countenance such a large bonus.

### CONCLUSION

The Tax Court carefully applied the five factor *Elliott* analysis and found that Martin's total compensation for fiscal year 1990 was unreasonable. In so doing, the court fulfilled its obligation to "spell out its reasoning and to do more than enumerate the factors and leap to a figure intermediate between petitioner's and the Commissioner's." *Leonard Pipeline Contractors, Ltd.,* 142 F.3d at 1135. Benchmarking an independent investor's expectations and recognizing that, despite a slight decline in 1990, Martin had done an excellent job in managing LabelGraphics, the Tax Court held that $406,000 ($156,000 salary and $250,000 bonus) was reasonable compensation to Martin for 1990. We hold that the Tax Court's determination was not clearly erroneous.

AFFIRMED.

---

12. The Tax Court did not consider the salaries of the other executives. Had the court done so, its conclusion likely would have been bolstered. *See Owensby & Kritikos, Inc.,* 819 F.2d at 1333 (noting disparity between compensation paid to the shareholders and that paid to nonshareholders). The Executive Vice President, Jerry Crispe, was compensat-ed according to a fixed formula based on net income. He received $50,000 salary, the same as the previous two years, and a bonus of $67,077, an increase of less than $10,000 over the previous year. Martin's son received his formula bonus plus an additional special bonus of $44,027 and Martin's wife received a one time bonus of $33,060.