T.C. Memo. 2004-219

UNITED STATES TAX COURT

BEINER, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14697-03.          Filed September 28, 2004.

<u>Philip Garrett Panitz</u> and <u>Ryan D. Schaap</u>, for petitioner.

<u>Jonathan H. Sloat</u> and <u>Leslie Vanderwalt</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioner petitioned the Court to redetermine the following deficiencies in Federal income taxes and related section 6662(a) accuracy-related penalties:[1]

---

[1] Section references, unless otherwise indicated, are to the applicable versions of the Internal Revenue Code (Code).  Rule references are to the Tax Court Rules of Practice and Procedure.

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1999 | $294,389 | $55,165.20 |
| 2000 | 405,286 | 81,057.20 |

Following petitioner's concessions, we decide whether petitioner may deduct the officer compensation of $1,087,000 and $1,350,000 that it claimed on its 1999 and 2000 Federal income tax returns, respectively. Respondent determined in the notice of deficiency that petitioner may deduct only $303,020 and $157,982 of the respective claimed amounts because petitioner had not shown that any greater amount was reasonable and paid for services. We hold that petitioner may deduct all of the claimed amounts but for $180,260 in 1999.[2] We also decide whether petitioner is liable for the portion of the accuracy-related penalty attributable to the $180,260. We hold it is not.

## FINDINGS OF FACT

Some facts were stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. Petitioner is a C corporation doing business as B & B Electric Sales. Its

---

[2] On the basis of this holding, we also hold without further discussion that petitioner is not liable for the portion of the accuracy-related penalty attributable to respondent's disallowed compensation for 2000 or the portion of the accuracy-related penalty attributable to respondent's disallowed compensation greater than $180,260 for 1999.

principal place of business was in Ventura, California, when its petition was filed in this Court.

A.  Petitioner's Business

Petitioner is a wholesale distributor of motor controls (parts) manufactured by Allen-Bradley.  It was incorporated in 1991 by Robert Lance Beiner (Beiner) and his brother.  Beiner and his brother owned petitioner's stock equally until 1992 when Beiner became (and remains today) petitioner's sole shareholder. Since December 2, 1991, Beiner has been petitioner's sole director and its president, secretary, and treasurer.  Since at least December 3, 1995, Beiner has also been petitioner's chief executive officer and its chief financial officer.

Petitioner began its business selling a wide range of materials made by various manufacturers.  Shortly after starting the business, Beiner concluded that no distributor in the United States stocked a wide range of parts made by Allen-Bradley, and he caused petitioner to limit its business to the sale of those parts.  Beiner surmised on the basis of his longtime experience as an electrical designer that petitioner's sale of only Allen-Bradley parts would be most profitable to it in that it could stock a wide range of those parts and immediately deliver them to customers upon request.  Other distributors of Allen-Bradley parts, and Allen-Bradley itself, were usually unable to deliver those parts until many days after a request.

Beiner's brother, who was Beiner's mentor in petitioner's business at the start of that business, disagreed with the change and as a result of the change disaffiliated himself entirely from any ownership or continued participation in petitioner. Numerous other individuals also believed that petitioner's new business would be a failure.

During the relevant years, Allen-Bradley sold its parts only to its authorized distributors and to original equipment manufacturers (OEMs). The authorized distributors sold the parts which they purchased from Allen-Bradley directly to end users. Allen-Bradley sold its parts to OEMs not for resale but to incorporate the parts into equipment that they manufactured and sold as finished products.

Petitioner is neither an OEM nor an authorized distributor of Allen-Bradley parts. Petitioner bought and sold Allen-Bradley parts in a bootleg market for those parts. During the subject years, petitioner purchased Allen-Bradley parts primarily from three OEMs. These OEMs purchased large quantities of Allen-Bradley parts either (1) directly from Allen-Bradley at prices which were deeply discounted from those of the retail market or (2) from one or more of Allen-Bradley's authorized distributors at prices which were commensurate with the retail market but which were subsidized by Allen-Bradley so as to reduce significantly the prices paid by the OEMs for those parts. These

OEMs intentionally purchased more parts than needed for their manufacturing process and resold the extra (surplus) parts to petitioner at prices far less than the prices which the authorized distributors paid Allen-Bradley for the same parts. During the relevant years, petitioner also purchased Allen-Bradley parts at fire sale prices from distressed companies which had either overbought the parts for their own needs or gone out of business.

Petitioner's inventory during the relevant years included approximately 50,000 different types of parts made by Allen-Bradley, including many parts that Allen-Bradley no longer manufactured but which were still used as replacement parts in some older equipment. Petitioner sold its inventory throughout the continental United States to approximately 1,100 customers at prices that approximated the prices at which the authorized distributors purchased those parts from Allen-Bradley. Petitioner's typical customers were (1) large plants, such as General Motors Corp., that had a nonperforming part that had to be replaced immediately rather than in the 2 or more days that it took to receive a replacement part from an authorized distributor, and (2) the authorized distributors of Allen-Bradley parts who also needed a part immediately rather than in the 2 or more weeks that it took to receive the part directly from Allen-Bradley.

The three OEMs sold their surplus parts to petitioner in violation of an understanding that they had with Allen-Bradley to not sell those parts other than as part of their finished products or, in some cases, as replacement parts for those products. Over the years, Beiner had developed a relationship with the three OEMs such that they sold their surplus parts to petitioner at the risk of Allen-Bradley's declaring that it would no longer sell parts to them or that it would do so only at inflated prices. Allen-Bradley learned during the subject years that one of the three OEMs, petitioner's then-largest supplier, was selling its surplus parts to petitioner. In 2000, Allen-Bradley charged this OEM more for the parts, and petitioner was unable to continue purchasing Allen-Bradley parts from that OEM at favorable prices. Petitioner's purchases from this OEM dropped from $1,199,628.53 in 1999 (approximately 64 percent of petitioner's purchases during that year) to $28,505.36 in 2000. To make up for this reduction, Beiner had petitioner purchase more Allen-Bradley parts from the other two OEMs and take steps to establish a relationship with a fourth OEM.

The three OEMs benefited from purchasing surplus parts and selling them to petitioner in that they paid less per unit when they purchased a greater quantity of parts which, in turn, increased their profit margins on their sale of the finished products. At least one of these OEMs also benefited from an

improved cashflow in that petitioner typically paid for its purchases within 10 days while the OEM usually had to wait at least 45 days to be paid on its sale of a finished product. The three OEMs were regularly asked by other persons to sell surplus parts to them, but the OEMs always turned these requests down. The three OEMs would have stopped selling their surplus parts to petitioner had Beiner become disaffiliated with it.

B.  Related Business

In 1997, Beiner and his brother incorporated California Controls, Inc. (California Controls), whose business is the same as petitioner's except that the parts that each sells are made by a different manufacturer. Beiner and his brother own California Controls equally, and they share equally in making its business decisions. During the subject years, Beiner worked for California Controls approximately 19 hours a week, and it compensated him for that work.

C.  Beiner's Background and His Management of Petitioner

Beiner was an electrical designer for 27 years before he and his brother incorporated petitioner. In that capacity, Beiner, either solely or with others, designed electrical systems for high-rise office buildings, large hotels, shopping centers, and numerous residential and commercial projects. Beiner's salary at the end of his career as an electrical designer was $90,000 to $100,000 a year.

During the subject years, Beiner's knowledge, experience, and relationships with the three OEMs were critical to petitioner's business and were indispensable to petitioner's operation and existence.  He also negotiated prices and other terms for petitioner, decided the price at which petitioner bought and sold its inventory, and knew the uses for each part in petitioner's inventory.  He established inventory controls, purchased inventory, resolved with the three OEMs problems concerning the shipment of parts to petitioner, and ascertained the quantity of each part that petitioner had to maintain in its inventory so that petitioner had a part when needed but did not have too many parts that sat idly on the shelf.  Petitioner had a computerized accounting system that monitored its inventory and allowed Beiner to set minimum and maximum amounts of each part that should be in inventory at any one time.  Generally once during each subject year, Beiner reviewed the prior year's sales of each part, including whether anything unusual occurred during the prior year that would have skewed those sales, and established each part's minimum and maximum amounts for each month of the current year.  Beiner's system of inventory generally allowed petitioner to turn over its inventory four times a year.

Beiner also set petitioner's corporate, accounting, and financial policies, which petitioner's other employees were not

authorized to change, and reviewed petitioner's financial statements and other records. He decided the credit limit that petitioner gave to each of its customers, and he was responsible for petitioner's exceptionally low number of uncollectible receivables. He also directed and evaluated employee performance and was responsible for hiring and firing all of petitioner's employees.

Petitioner conducted its business out of a warehouse with small offices in front, and it dealt with its customers by telephone rather than face to face. During the subject years, Beiner worked directly for petitioner approximately 38 hours per week, in addition to the approximately 19 hours per week which he worked for California Controls, and he generally was at petitioner's warehouse approximately 85 percent of the hours in its workweek. When he was away from the warehouse, he remained accessible to his staff by cell phone, facsimile, and overnight mail, and he continued to make all of petitioner's managerial and policy decisions and to direct and control petitioner's business.

In January 2000, Beiner suffered a heart attack, and he stayed away from petitioner's warehouse for approximately 60 days. Petitioner's business did not grow during that 60-day period.

D.  Petitioner's Other Employees

In addition to Beiner, petitioner employed five individuals during the subject years.  Each of these other employees reported to Beiner.  These other employees and their positions or the departments in which they worked were as follows:

| Name | Position or Department |
|------|------------------------|
| Adam Caldwell (Caldwell) | Vice president and sales manager |
| Jennifer Shows (Shows)[1] | Purchasing manager |
| Becky Gonzalez (Gonzalez) | Office manager |
| Frankki R. Andrade (Andrade) | Receiving and sales |
| James T. Loftus (Loftus) | Shipping |

[1] Shows is now named Jennifer Caldwell.  We refer to her by her former name, which was her name during the subject years.

Petitioner paid salaries to Caldwell, Shows, and Gonzalez in a capacity that it designated during the subject years as "clerical".  Petitioner paid salaries to Andrade and Loftus in a capacity that it designated during the subject years as "warehouse work".  Petitioner paid a salary to Beiner in a capacity that it designated during the subject years as "officer".

Caldwell began working for petitioner in 1991, and he has served as its vice president since 1992.[3]  During the subject

---

[3] During the relevant years, petitioner's officers were Beiner, Caldwell, and Donna Marie Beiner.  (The record does not disclose the relationship, if any, between this woman and Beiner.)  In 1993, Caldwell was petitioner's second vice president, and Donna Marie Beiner was petitioner's first vice president.  Since at least Dec. 3, 1995, Caldwell and Donna Marie Beiner have both been vice presidents of petitioner, without any

(continued...)

years, he oversaw the ministerial aspects of petitioner's daily operations. He also took orders for parts placed by petitioner's customers, informed petitioner's customers about the pricing and availability of those parts, and gave petitioner's customers technical support as to the use of those parts. He did not solicit any business for petitioner, and he did not perform any managerial duties. He regularly consulted with Beiner on matters pertaining to petitioner's business, including all matters which required a managerial decision.

Shows also took orders for parts placed by petitioner's customers, in a capacity very similar to Caldwell's. She spoke with petitioner's customers by telephone, and she entered those orders into petitioner's computer. She also helped enter other information into the computer.

Gonzalez worked with petitioner's finances, including its payroll, accounts receivable, accounts payable, billing, and invoicing. She also prepared certain monthly and weekly financial reports for Beiner's review. The weekly reports showed the balances of petitioner's bank accounts, accounts receivable, open purchase orders, accounts that were 45 days or older, and a 6-week cash report. The monthly reports included profit and loss statements, bank reconciliations, and sales information listed by

---

[3](...continued)
distinction in title.

product and profit percentages. The sales information also included the frequency and amount of each customer's sales and showed whether that customer was paying as required. Gonzalez regularly discussed each of these weekly and monthly reports with Beiner.

Gonzalez also was responsible for setting up petitioner's new sales accounts. She spoke to each new customer, performed a credit check on the customer, and relayed the substance of her conversation and the result of her credit check to Beiner along with the customer's request for credit. Beiner then decided the amount of credit that petitioner would allow the new customer, and Beiner relayed this decision back to Gonzalez. Gonzalez also was responsible for ordering office supplies.

Andrade worked in the warehouse. She generally received the parts which were purchased by and shipped to petitioner, verified that the underlying orders were correct, and stocked those parts in the warehouse. She also took orders for parts placed by petitioner's customers, verified that the requested parts were in stock, processed the orders (including shipping the parts from petitioner to its customers), and verified that the correct part was shipped to the correct location. She also helped enter information into petitioner's computer.

Loftus was a shipping clerk. He assisted Andrade in the warehouse.

E.  Petitioner's Employee Compensation

    In 1999, petitioner paid its employees the following

salaries (exclusive of bonuses), bonuses, and total compensation

(inclusive of bonuses):

| Name | Salary | Bonus | Total Compensation |
|------|--------|-------|--------------------|
| Beiner | $600,000.00 | $487,000 | $1,087,000.00 |
| Caldwell | 45,759.92 | 12,500 | 58,259.92 |
| Shows | 38,133.28 | 12,500 | 50,633.28 |
| Gonzalez | 37,440.08 | 5,000 | 42,440.08 |
| Andrade | 29,466.64 | 2,000 | 31,466.64 |
| Loftus | 24,266.64 | 2,000 | 26,266.64 |
| Total | 775,066.56 | 521,000 | 1,296,066.56 |

Petitioner deducted the $1,087,000 paid to Beiner as officer

compensation.  Petitioner deducted the $209,067 paid to the other

employees as salaries and wages paid to nonofficers.

    In 2000, petitioner paid its employees the following

salaries (exclusive of bonuses), bonuses, and total compensation

(inclusive of bonuses):

| Name | Salary | Bonus | Total Compensation |
|------|--------|-------|--------------------|
| Beiner | $600,000.00 | $750,000 | $1,350,000.00 |
| Caldwell | 53,806.72 | 17,500 | 71,306.72 |
| Shows | 44,433.32 | 15,000 | 59,433.32 |
| Gonzalez | 44,086.68 | 7,500 | 51,586.68 |
| Andrade | 34,366.60 | 3,000 | 37,366.60 |
| Loftus | 29,160.00 | 2,500 | 31,660.00 |
| Total | 805,853.32 | 795,500 | 1,601,353.32 |

Petitioner deducted the $1,350,000 paid to Beiner as officer

compensation.  Petitioner deducted the $251,353 paid to the other

employees as salaries and wages paid to nonofficers.

Petitioner did not have a formal compensation plan, and it did not have a written employment agreement with Beiner. During each subject year, petitioner generally paid its employees other than Beiner one twenty-fourth of their annual salary on the 1st and the 15th of each month, and it paid them bonuses on December 31. During both years, Beiner generally was entitled to a fixed salary of $50,000 per month and a bonus in December. Beiner did not always receive the monthly salary to which he was entitled when he was entitled to it because of problems that petitioner experienced with its cashflow. During 1999, petitioner paid $25,000 in salary to Beiner on January 1, September 1, September 15, October 1, October 15, November 1, November 15, December 1, and December 15, and it paid $862,000 (inclusive of the $487,000 bonus) to Beiner on December 31. During 2000, petitioner paid $25,000 in salary to Beiner on January 1, January 15, February 1, February 15, June 1, June 15, July 1, July 15, August 1, August 15, September 1, September 15, October 1, October 15, November 1, November 15, December 1, and December 15, and it credited him with two payments of $450,000 (inclusive of the $750,000 bonus) on December 31.

In December of each subject year, petitioner's accountant, Thomas Gallardo (Gallardo), met with Beiner to ascertain the bonus that petitioner paid to Beiner during that year. Petitioner generally ascertained each bonus by using a formula

that took into account its sales and profit for that year,
Beiner's work during that year, and the amount of its profit that
it needed to retain at the end of that year for its operation
after that year.

F.  Petitioner's Financial Condition

Petitioner was established with a capital contribution of
$7,000.  As of December 31, 1999 and 2000, petitioner reported
that its shareholder equity consisted of the following:

|  | 1999 | 2000 |
| --- | --- | --- |
| Common stock | $7,000 | $7,000 |
| Retained earnings | 365,513 | 747,857 |
|  | 372,513 | 754,857 |

For 1999 and 2000, petitioner's gross and net sales
(collectively, sales), costs of goods sold, gross profits,
taxable income, total taxes, and net income, each as reported,
and the ratios of its gross profits to its sales, expressed as
percentages, were as follows:

|  | 1999 | 2000 |
| --- | --- | --- |
| Sales | $3,473,802 | $3,485,568 |
| Cost of goods sold | 1,760,084 | 1,064,976 |
| Gross profit | 1,713,718 | 2,420,592 |
| Taxable income | 143,926 | 579,984 |
| Total tax | 39,381 | 197,195 |
| Net income | 104,545 | 382,789 |
| Ratio of gross profits to sales | 49.3 | 69.4 |

In petitioner's first taxable year of operation, a period of
32 weeks that ended on December 31, 1991, its sales totaled

$184,449. Petitioner reported a small loss for that 32-week period and reported profits in each year since through 2000.

Petitioner has never paid a dividend. Its return on equity using average annual shareholder equity was as follows for 1991 through 2000:

| Year | Return on Equity |
|------|------------------|
| 1991 | -102.2% |
| 1992 | 113.6 |
| 1993 | 70.0 |
| 1994 | 82.0 |
| 1995 | 23.7 |
| 1996 | 39.1 |
| 1997 | 28.9 |
| 1998 | 20.0 |
| 1999 | 32.6 |
| 2000 | 67.9 |

G. Martin Wertlieb (Wertlieb)

Wertlieb testified at trial as petitioner's witness. The parties stipulated that Wertlieb was an expert on executive compensation, and the Court recognized him as such.[4] Wertlieb has worked for over 30 years in the compensation and personnel field, and he currently heads his own compensation consulting firm. He has advised a wide range of clients on the subject of executive compensation, and he has testified before both Congress and the courts as an expert on executive compensation. He opined in this case that

---

[4] Respondent also called an individual (James F. Carey) to testify as an expert on compensation but withdrew that individual before he was recognized as an expert.

Based on the facts and circumstances of this case; our understanding of the importance of Mr. Beiner's contribution to the very existence and success of the business; our analysis of compensation paid to chief executives in other comparable companies; the financial performance of Beiner, Inc., during the years in question as compared to the financial performance of other similar wholesaler distributors; and our knowledge, judgment and experience in executive compensation, it is my opinion that Mr. Beiner's reasonable compensation for the year ending December 31, 1999 was $906,740 and that his reasonable compensation for the year ending December 31, 2000 was $1,533,093.

The relevant standard industrial classification (SIC) codes 5063 and 5065 include every (34 in total) publicly held wholesale distributor of electrical or electronic parts and components that filed reports with the Securities and Exchange Commission (SEC) during 1999 and 2000. In reaching his opinion, Wertlieb reviewed the financial statements of each of these companies and noted their sales, pretax income, and chief executive officer compensation. He broke that compensation into two parts. The first part, "fixed compensation", included annual salary and the value of any special benefits reported as "other compensation" in the company's SEC filings. The second part, "variable compensation", included annual bonuses contingent on company profits and the value of any stock awards or longterm incentive payouts made during the year. The fixed compensation paid by the 34 companies ranged from $70,123 to $1,439,676 and averaged $399,426. The variable compensation paid by the 34 companies ranged from zero to approximately $3.4 million. The relationship

between variable compensation and company profits ranged from 0 to 64.4 percent.

Wertlieb testified that the fixed compensation paid to a chief executive officer typically correlates with the sales of his or her company and that this correlation may be expressed in a mathematical formula that may be used to calculate the "average" fixed compensation for the chief executive officer of any size company near and within the range of the data. Wertlieb testified that variable compensation of a chief executive officer also correlates with his or her company's sales. Wertlieb concluded that Beiner's reasonable compensation for each subject year equaled the sum of: (1) Petitioner's gross profit less the gross profit that petitioner would have realized had it performed at the ratio of gross profit to sales corresponding to the 90th percentile of the 34 companies (31.49 percent for 1999 and 34.47 for 2000) (excess gross profits), (2) fixed compensation consistent with the nature and size of petitioner and the amounts paid at the 90th percentile of the 34 companies, as ascertained using the referenced correlation for fixed compensation, and (3) variable compensation consistent with prevailing executive incentive practices and contingent on the level of sales and profit performance, as ascertained using the referenced correlation for variable compensation. Wertlieb calculated these amounts as follows:

|                        | 1999      | 2000        |
|------------------------|-----------|-------------|
| Excess gross profits   | $619,740  | $1,219,270  |
| Reasonable salary      | 166,000   | 166,000     |
| Reasonable incentive   | 121,000   | 147,823     |
| Total                  | 906,740   | 1,533,093   |

As further support for his opinion, Wertlieb also calculated and compared for petitioner and each of the 34 companies (1) the percentage return on equity and (2) the ratio (expressed as a percentage) of gross profit to sales. As to the former, Wertlieb calculated petitioner's pretax return on equity (taxable income as ascertained by Wertlieb divided by ending shareholder equity) as follows:

|                                      | 1999        | 2000        |
|--------------------------------------|-------------|-------------|
| Sales                                | $3,473,802  | $3,485,568  |
| Cost of goods sold                   | 1,760 084   | 1,064,976   |
| Gross profit                         | 1,713,718   | 2,420,592   |
| Gross profit at 90th percentile      | 1,093,978   | 1,201,322   |
| Excess gross profit                  | 619,740     | 1,219,270   |
| Reasonable salary                    | 166,000     | 166,000     |
| Reasonable incentive                 | 121,000     | 147,823     |
| Total reasonable compensation        | 906,740     | 1,533,093   |
| Officer compensation deducted        | 1,087,000   | 1,350,000   |
| Over (under) reasonable              | 180,260     | (183,093)   |
| Taxable income, as reported          | 143,926     | 579,984     |
| Adjusted taxable income              | 324,186     | 396,891     |
| Shareholder equity at end of year    | [1]372,857  | 754,857     |
| Pretax return on equity              | 86.9%       | 52.6%       |

[1] This amount was actually $372,513. We consider the difference in figures immaterial to our analysis.

He compared these returns to the 34 companies as follows:

|  | Taxable Income As a Percentage of Shareholder Equity | |
|  | 1999 | 2000 |
| Petitioner | 86.9% | 52.6% |
| SIC code 5063 and 5065 companies: | | |
| High | 49.9 | 49.5 |
| 90th Percentile | 29.1 | 34.9 |
| 3d Quartile | 21.6 | 23.6 |
| Median | 12.8 | 12.6 |
| Mean | 1.6 | -46.7 |

He concluded from this calculation that approximately one-third of the 34 companies lost money for their shareholders in each of the analyzed years and that the return on equity produced by petitioner in both subject years exceeded the maximum return of any of the 34 companies.

As to the latter calculation, the ratio of gross profit to sales (expressed as a percentage), Wertlieb calculated for petitioner and each of the 34 companies the following percentages:

|  | Gross Profit As A Percentage of Sales | |
|  | 1999 | 2000 |
| Petitioner | 49.3% | 69.4% |
| SIC code 5063 and 5065 companies: | | |
| High | 50.6 | 48.2 |
| 90th Percentile | 31.5 | 34.5 |
| Median | 20.4 | 22.5 |
| Mean | 20.4 | 22.1 |
| 10th Percentile | 8.6 | 9.0 |

Wertlieb concluded that petitioner outperformed the 34 companies in terms of that calculation with one exception in 1999.

OPINION

A.  Deduction of Compensation Paid to Beiner

We decide whether section 162(a)(1) allows petitioner to deduct as reasonable compensation the portion of the officer compensation claimed paid to Beiner and disallowed by respondent in the notice of deficiency.[5]  A payment of compensation is deductible under section 162(a)(1) only if it is both (1) reasonable in amount and (2) paid for services actually rendered to the payor in or before the year of payment.  Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930); LabelGraphics, Inc. v. Commissioner, 221 F.3d 1091, 1095 (9th Cir. 2000), affg. T.C. Memo. 1998-343; O.S.C. & Associates, Inc. v. Commissioner, 187 F.3d 1116, 1119-1120 (9th Cir. 1999), affg. T.C. Memo. 1997-300; Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282; Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir.

---

[5] Sec. 162(a)(1) provides:

> SEC. 162(a).  In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--
>
> (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

1974), affg. T.C. Memo. 1971-200; Pac. Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Haffner's Serv. Stations, Inc. v. Commissioner, T.C. Memo. 2002-38, affd. 326 F.3d 1 (1st Cir. 2003); sec. 1.162-7(a), Income Tax Regs. Petitioner conceded at trial that it must prove that section 162(a)(1) allows it to deduct compensation in an amount greater than that determined by respondent.[6] See Rule 142(a)(1); see also LabelGraphics, Inc. v. Commissioner, supra at 1095. Careful scrutiny of the facts is appropriate in a case such as this where the payor is controlled by a payee/employee. Elliotts, Inc. v. Commissioner, supra at 1243; Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d 313, 315-316 (8th Cir. 1975), affg. T.C. Memo. 1974-44; Haffner's Serv. Stations, Inc. v. Commissioner, supra. We must be persuaded that the purported compensation was paid for services rendered by the employee, as opposed to a distribution of earnings to him that the payor could not deduct. Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153 (and the cases cited therein).

Respondent argues in his brief that the disallowed compensation was neither reasonable nor paid for Beiner's services. Respondent asserts that the disallowed compensation represented funds that petitioner did not need for its operation

---

[6] Given this concession, we conclude that sec. 7491(a), which in certain circumstances places the burden of proof upon the Commissioner, is not applicable here.

and had to expend to avoid the accumulated earnings tax of section 531. Respondent asserts that Beiner performed minimal, nonspecialized services for petitioner during each subject year and that those services did not entitle petitioner to deduct the disputed payments as compensation. Petitioner argues in its brief that the disallowed compensation was reasonably paid to Beiner for his services. Petitioner asserts that Beiner was skilled in and deeply involved with petitioner's business and that his services resulted in petitioner's realizing a superior return on equity in each subject year. Petitioner asserts that these rates of return would have caused a hypothetical inactive independent investor to pay Beiner the same amount of compensation that petitioner paid him during those years.

In support of their arguments, both parties rely upon the opinion of the Court of Appeals for the Ninth Circuit in Elliotts, Inc. v. Commissioner, supra at 1245-1248. Because this case is most likely appealable to that court, see sec. 7482(b)(1)(B), we do the same, see Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Pursuant to that opinion, we generally determine the deductibility of the compensation paid to Beiner by focusing on its reasonableness, and we decide that reasonableness by considering five factors from the perspective of a hypothetical inactive independent investor. Elliotts, Inc. v. Commissioner,

supra at 1243-1245.  The five factors are:  (1) The employee's role in the company; (2) a comparison of the compensation paid to the employee with the compensation paid to similarly situated employees in similar companies (external comparison); (3) the character and condition of the company; (4) whether a conflict of interest existed that might have permitted the company to disguise dividend payments as deductible compensation; and (5) whether the company's payments of compensation to all of its employees were internally consistent (internal consistency).  Id. at 1245-1248.  As to each factor, we ask ourselves the following question:  "Would a hypothetical inactive independent investor consider the factor favorably to require the payment of the disputed compensation to Beiner in order to retain his services during each of the subject years?"  See Haffner's Serv. Stations, Inc. v. Commissioner, supra; cf. Elliotts, Inc. v. Commissioner, supra at 1245.  An answer in the negative indicates that the payment of the compensation was not sufficiently tied to Beiner's services to constitute personal service income but was more likely a distribution of earnings.  An answer in the affirmative supports deducting the disputed compensation as personal service compensation.  A relevant consideration in answering our question is whether the hypothetical inactive independent investor, after taking into account the amount of the compensation paid to Beiner, would receive at least the minimum return anticipated on

an investment in petitioner.  See <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d at 1245; <u>Haffner's Serv. Stations, Inc. v. Commissioner</u>, <u>supra</u>.

We are assisted in this case by Wertlieb.  In light of his qualifications and with due regard to all other credible evidence in the record, we consider Wertlieb's training, knowledge, and judgment to be most helpful to our understanding of the executive compensation issue at hand.  See Fed. R. Evid. 702; <u>Snyder v. Commissioner</u>, 93 T.C. 529, 534 (1989).  Wertlieb testified at trial through his expert report (report).  See Rule 143(f).  The Court accepted that report into evidence without any objection from respondent.  Respondent also declined to cross-examine Wertlieb as to its contents.

We turn to the five factors and analyze them seriatim.  None of these factors is decisive in and of itself.  <u>LabelGraphics, Inc. v. Commissioner</u>, 221 F.3d at 1095.

### 1.  Employee's Role in the Company

We analyze Beiner's role in petitioner's business.  A relevant consideration is his general importance to petitioner's success.  See <u>Elliotts, Inc. v. Commissioner</u>, <u>supra</u> at 1245.  Other considerations include his position, hours worked, and duties performed.  See <u>id.</u>

Beiner is an experienced electrical designer who had the devotion, dedication, intelligence, foresight, and skill to

tailor petitioner's business to the exclusive sale of Allen-Bradley parts and to manage petitioner's business profitably throughout the subject years. At all relevant times, he was petitioner's chief executive officer, chief financial officer, president, secretary, and treasurer, and, in those capacities, he performed duties the nature, extent, and scope of which were fundamental, substantial, and encompassing. He was primarily responsible for petitioner's extraordinary growth, he was irreplaceable in petitioner's business operation and important to its success, and his services performed for petitioner were directly and inextricably related to the volume of its sales. In fact, when Beiner was unable to frequent petitioner's warehouse for the 60-day period in 2000, its sales ceased to grow.

Although Beiner did not work exceptionally long hours in petitioner's business during the subject years (he worked for petitioner an average of approximately 38 hours per week), nor devote 100 percent of his time to that business (he additionally worked approximately 19 hours a week for California Controls), he cofounded petitioner's business and has worked there continuously since its inception in a managerial capacity as its primary officer and its most valuable employee. In addition, his role was distinguishable from the role of each of petitioner's other employees, all of whom he directed and supervised, in that they,

unlike he, performed clerical, nonmanagerial work.  Petitioner's business would have suffered dramatically, if not ceased altogether, had Beiner disaffiliated himself from petitioner during the subject years; any void created by his loss could not have been filled by one or more other employees.  Moreover, as noted by Wertlieb, employees such as Beiner are not paid on an hourly basis but are paid for their leadership, knowledge, and experience and for their ultimate accountability in achieving company goals.  In this regard, Wertlieb noted, Beiner was the locomotive of petitioner's business, and, but for him, petitioner would not have been able to obtain its inventory at the discount prices that allowed it to function as profitably as it did.  In fact, Wertlieb noted, the special relationships which Beiner developed with the three OEMs allowed petitioner to report greater gross profit margins and returns on sales and investment than virtually any other similar public company for which data was available for 1999 and 2000.

Respondent concedes that Beiner played an "important" role in petitioner's business.  However, respondent asserts, Beiner's services were nonspecialized, Beiner spent little time in petitioner's business, Beiner devoted a significant amount of his time to working for California Controls, and Beiner's brother was a primary income-producing factor in petitioner's business.

Respondent concludes that Beiner's services for petitioner did not entitle it to pay to him the compensation that it did.

We disagree with respondent's assertions and conclusion. As we see it, the most important element of petitioner's business was its purchase of Allen-Bradley parts at prices less than those paid by the authorized distributors, and those purchases at those prices were the direct product of one employee; i.e., Beiner. But for petitioner's employment of Beiner, petitioner would not have been able to obtain its Allen-Bradley inventory and to operate as profitably as it did, let alone to even operate at all. Given the double-digit rates of return on petitioner's equity during the subject years, we believe that a hypothetical inactive independent investor who was knowledgeable of Beiner's role in petitioner's operation and the significant effect that he had upon its profitability would have paid the disputed compensation to Beiner in order to retain his services.

Moreover, contrary to respondent's assertion, Beiner did not spend little time in petitioner's business during each subject year. While respondent asks the Court to find as a fact that Beiner worked in petitioner's business approximately 6 to 10 hours per week during the subject years and that Caldwell was at that time the business's spearhead, the credible evidence in the record supports a contrary finding, which we make, that Beiner during the subject years worked in petitioner's business

approximately 38 hours a week as its most valuable employee.  Nor does the record support respondent's second assertion that Beiner's brother was a primary income-producing factor in petitioner's business.  When Beiner caused petitioner in 1992 to limit its business to Allen-Bradley parts, Beiner's brother disaffiliated himself entirely from any continued participation in the business.  Although respondent notes correctly in his third assertion that Beiner spent approximately one-third of his time during the subject years working for California Controls, respondent ignores in this regard that Beiner spent the other two-thirds of his time working for petitioner in a role that was most significant to its existence and profitability.

We conclude that a hypothetical inactive independent investor would consider this factor favorably to require the payment of the disputed compensation to Beiner in order to retain his services during each of the subject years.

2.  <u>External Comparison</u>

This factor compares the employee's salary with the salaries paid by similar companies for similar services.  Elliotts, Inc. v. Commissioner, 716 F.2d at 1246.

Wertlieb's testimony is the only evidence in the record as to this factor.  Wertlieb reviewed the financial statements of the 34 referenced companies and the compensation paid to their chief executive officers.  Wertlieb opined that petitioner was

substantially more profitable than virtually all of the 34 companies in terms of the ratio of gross profit to sales. Wertlieb opined that petitioner returned more as a percentage of equity to its investor than any of the 34 companies returned to their investors. Wertlieb concluded that Beiner's reasonable compensation for the respective subject years was $906,740 and $1,533,093 and that these amounts were consistent with the salaries paid by similar companies for similar services. Wertlieb noted that Beiner was performing the functions of a wide range of employees.

Respondent argues that we should ignore the "Excess Gross Profits" portion of Wertlieb's report as to Beiner's reasonable compensation because, respondent states: "Wertlieb provided no evidence that any of the companies he surveyed employed such a compensation plan." We decline to do so. First, experts, but for their testimony, are not the source of evidence; the parties are. See United States v. Scheffer, 523 U.S. 303, 317 n. 13 (1998). Second, Wertlieb's testimony, all of which was credible and without contradiction, was that an employer such as petitioner may pay an employee such as Beiner reasonable compensation inclusive of all gross profit in excess of the gross profit that the employer would have realized had it performed at the 90th percentile of similar public companies. In a case such as this, where Beiner's services were directly, if not solely,

related to petitioner's realization of those excess gross profits, we agree with Wertlieb that petitioner is entitled to pay those profits to Beiner as compensation for his work.  See Elliotts, Inc. v. Commissioner, supra at 1248.

We conclude that a hypothetical inactive independent investor would consider this factor favorably to require the payment of up to $906,740 and $1,533,093 in compensation to Beiner in the respective years in order to retain his services during each of those years.

3.  Character and Condition of the Company

This factor concerns petitioner's character and condition. The focus of this factor may be on petitioner's size as indicated by its sales, net income, or capital value.  The complexities of petitioner's business and the general economic conditions are also relevant.  Id. at 1246.

Petitioner was established in 1991 with a $7,000 capital contribution.  In each year after its first short taxable year, petitioner was an extremely well-managed, profitable company in that it experienced extraordinary growth in sales and shareholder equity.  During the respective subject years, its sales totaled $3,473,802 and $3,485,568, and its gross profit totaled $1,713,718 and $2,420,592.  At the end of the respective years, its shareholder equity totaled $372,513 and $754,837.  During the subject years, its customers were located throughout the United

States and totaled approximately 1,100.  In short, petitioner had during the subject years a strong character and a strong financial condition.

Respondent argues that petitioner was a simple (as opposed to complex) business that required few personal skills.  We disagree.  During the respective subject years, neither petitioner's sales nor its gross profits could have been attained but for the personal skill of Beiner in obtaining Allen-Bradley parts at prices less than those at which the same types of parts were sold to the authorized distributors.[7]  Although petitioner's business may not be the most complex business in operation, we do not consider it to have been a simple task for petitioner to have purchased its Allen-Bradley inventory from the three OEMs at deeply discounted prices given their agreement with Allen-Bradley not to sell those parts at all except in a very limited situation that did not apply here.

We conclude that a hypothetical inactive independent investor would consider this factor favorably to require the payment of the disputed compensation to Beiner in order to retain his services during each of the subject years.

---

[7] We find nothing in the record to indicate that these sales were attributable to the general economic conditions.

4. Conflict of Interest

This factor focuses on whether a relationship exists between the corporation and its employee which might allow the corporation to disguise nondeductible dividends as deductible salary. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246. Such an exploitation of a relationship may exist where, as here, the employee is the corporate employer's sole shareholder. Id.

> The mere existence of such a relationship, however, when coupled with the absence of dividend payments, does not necessarily lead to the conclusion that the amount of compensation is unreasonably high. * * *

> In such a situation, * * * it is appropriate to evaluate the compensation payments from the perspective of a hypothetical independent investor. If the bulk of the corporation's earnings are being paid out in the form of compensation, so that the corporate profits, after payment of the compensation, do not represent a reasonable return on the shareholder's equity in the corporation, then an independent shareholder would probably not approve of the compensation arrangement. If, however, that is not the case and the company's earnings on equity remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. [Id. at 1246-1247.]

Accord LabelGraphics, Inc. v. Commissioner, 221 F.3d at 1099. In Elliotts, Inc. v. Commissioner, supra at 1247, the Court of Appeals for the Ninth Circuit concluded that the 20-percent average rate of return on equity for the 2 years at issue there would satisfy a hypothetical inactive independent investor and indicate that the corporate employer and its shareholder/employee were not exploiting their relationship.

Petitioner's return on equity (net income/shareholder equity at the end of the year) during the subject years was 28.1 percent and 50.1 percent, respectively (104,545/372,513; 382,789/754,857). Petitioner's consistently high return on equity resulted in an increase in shareholder equity from $7,000 to over $754,000 during petitioner's short existence through 2000. We believe that returns of this magnitude would satisfy an independent investor.

Respondent asserts that petitioner during the respective subject years paid Beiner 31.3 and 38.7 percent of its gross receipts and 88.3 and 69.9 percent of its net income (adding back compensation). Respondent points the Court to Alpha Med. Inc. v. Commissioner, 172 F.3d 942, 948 (6th Cir. 1999), revg. T.C. Memo. 1997-464, where the Court of Appeals for the Sixth Circuit held that payments to a sole shareholder of 44.9 percent of gross receipts and 64.6 percent of net income were unreasonable. Respondent concludes that the compensation payments to Beiner also were unreasonable.

We disagree with respondent that the mere fact that a corporation pays its most valuable employee compensation in an amount exceeding a certain percentage of gross receipts or net income means that part or all of the compensation is unreasonable. The amount of reasonable compensation that may be paid to a corporate officer such as Beiner is a question of fact

that must be resolved on the basis of all credible evidence in the record. See Pac. Grains, Inc. v. Commissioner, 399 F.2d at 605. Here, Beiner was vital and indispensable to petitioner's success and performed for petitioner services which were directly and inextricably tied to petitioner's profitability. In addition, from the view of a hypothetical inactive independent investor, the returns on equity after taking into account the disputed compensation payments were meaningful.

We conclude that a hypothetical inactive independent investor would consider this factor favorably to require the payment of the disputed compensation to Beiner in order to retain his services during each of the subject years.

5. Internal Comparison

Evidence of internal inconsistency in a company's treatment of payments to its employees may indicate the presence of unreasonable compensation. Elliotts, Inc. v. Commissioner, supra at 1247.

Respondent argues that the compensation that petitioner paid to Beiner vis-a-vis its nonowner/officer Caldwell and to Beiner vis-a-vis all of its employees shows that Beiner's compensation was unreasonable. We disagree. As previously stated, we believe that a hypothetical inactive independent investor would view Beiner's compensation during 1999 and 2000 as reasonable. The fact that petitioner paid Beiner compensation that was much

greater than the separate or collective compensation that it paid to its employees who worked under Beiner is explained by noting that petitioner's profits were derived almost exclusively through the all-encompassing, far-reaching efforts of Beiner and that petitioner's other employees had limited roles in that profitability.

We conclude that a hypothetical inactive independent investor would consider this factor favorably to require the payment of the disputed compensation to Beiner in order to retain his services during each of the subject years.

6. Compensatory Intent

In addition to our decision on the five factors just discussed, respondent invites the Court to decide petitioner's intent in making the disputed payments to Beiner. Specifically, respondent argues, the compensation paid to Beiner was not paid with the requisite compensatory intent but represented the earnings that petitioner did not need to retain in its operation and had to expend to avoid the accumulated earnings tax of section 531. Respondent supports this argument by asserting that petitioner has never paid a dividend, that petitioner paid Beiner compensation in 1999 and 2000 equal to 88.3 and 69.9 percent of those respective years' net income, and that Beiner's compensation increased during those years from $970,000 to $1,350,000 although, respondent states, Beiner reduced his hours

during those years almost fourfold to approximately 6 to 10 hours per week.

We decline respondent's invitation to decide petitioner's intent in making the disputed payments to Beiner. This case is not one of those "rare [cases] where there is evidence that an otherwise reasonable compensation payment contains a disguised dividend * * * [so that our] inquiry may expand into compensatory intent apart from reasonableness". Elliotts, Inc. v. Commissioner, 716 F.2d at 1244-1245; cf. O.S.C. & Associates, Inc. v. Commissioner, 187 F.3d 1116 (9th Cir. 1999). Contrary to respondent's assertion, petitioner did not ascertain Beiner's compensation simply by ascertaining the earnings that it needed to retain in its operation and the earnings that it had to expend to avoid the accumulated earnings tax of section 531. Petitioner set Beiner's salary at $50,000 per month at or before the beginning of the subject years, and it ascertained Beiner's bonus for each of those years by taking into account petitioner's sales and profit for that year, Beiner's work during that year, and the amount of petitioner's profits that petitioner needed to retain for its future operation. Indeed, after the bonuses were paid for the subject years, petitioner even retained a meaningful amount of its earnings upon which it paid significant Federal income taxes.

In addition, the fact that petitioner has never paid a dividend does not control our analysis. As the Court of Appeals for the Ninth Circuit stated in a similar setting, the court will "not presume an element of disguised dividend from the bare fact that a profitable corporation does not pay dividends." Elliotts, Inc. v. Commissioner, supra at 1244. Nor is it decisive that petitioner may have paid Beiner compensation in 1999 and 2000 equal to 88.3 and 69.9 percent of those respective years' net income. As we stated supra in rejecting the same argument, the amount of reasonable compensation that may be paid to a corporate officer such as Beiner is a question of fact that must be resolved on the basis of all credible evidence in the record. Finally, from a factual point of view, we have already noted our disagreement with respondent's proposed finding that Beiner reduced the number of hours that he worked in petitioner's business during the subject years.

7. Conclusion

We have concluded as to four of the five factors that a hypothetical inactive independent investor would pay the disputed compensation to Beiner in order to retain his services during each of the subject years. We have concluded as to the remaining factor, namely, an external comparison, that a hypothetical inactive independent investor would limit Beiner's compensation in the subject years to $906,740 and $1,533,093, respectively.

On the balance, we believe that Beiner's reasonable compensation for 1999 should be capped at $906,740, as testified by Wertlieb. That testimony takes into account the comparative salaries in the industry which we believe is most relevant to our decision herein. See Metro Leasing & Dev. Corp. v. Commissioner, 376 F.3d 1015, 1119 (9th Cir. 2004) (the fact that a hypothetical inactive independent investor would pay an employee compensation equal to an amount in dispute is not decisive in and of itself), affg. T.C. Memo. 2001-119; see also Menard, Inc. v. Commissioner, T.C. Memo. 2004-207 (although compensation paid to an employee may satisfy the independent investor test of Exacto Spring Corp. v. Commissioner, 196 F.3d 833 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220, the compensation may be unreasonable within the context of section 162(a)(1) to the extent that it exceeds the compensation paid by a comparable company to a similarly situated employee). Although Wertlieb also testified that Beiner's compensation for both subject years was really only overstated by $2,833; i.e., the amount by which the $2,437,000 paid to him during both years ($1,087,000 + $1,350,000) exceeded the $2,439,833 of reasonable compensation ascertained by Wertlieb for those years ($906,740 + $1,533,093), we believe it appropriate to view each year separately rather than collectively and hold that petitioner correctly reported Beiner's compensation for 2000 but overreported his compensation

for 1999 by $180,260 ($1,087,000 - $906,740).  While there is firm authority for the proposition that compensation paid in one year may be deductible in that year if paid to make up for undercompensation of services rendered to the payor in or before the year of payment, e.g., Lucas v. Ox Fibre Brush Co., 281 U.S. at 119, the same is not true in the case of a payment for services to be performed in the future, e.g., Maple v. Commissioner, T.C. Memo. 1968-194, affd. 440 F.2d 1055 (9th Cir. 1971).  Moreover, from a factual point of view, petitioner makes no claim that the $180,260 was paid in 1999 for services that Beiner would render in 2000.  We hold that Beiner's reasonable compensation for the subject years was $906,740 and $1,533,093, respectively.

B.  Accuracy-Related Penalty for 2000

Respondent also determined that petitioner was liable for an accuracy-related penalty under section 6662(a) and (b)(1).  That section in relevant part imposes a 20-percent accuracy-related penalty on the portion of an underpayment that is due to negligence or intentional disregard of rules or regulations. Negligence includes a failure to attempt reasonably to comply with the Code.  Sec. 6662(c).  Disregard includes a careless, reckless, or intentional disregard.  Id.

Petitioner, in order to prevail, must prove respondent's determination wrong.  See Rule 142(a).[8]  Petitioner argues in part that it is not liable for the accuracy-related penalty because it did not exploit its relationship with Beiner in paying him the compensation that it did.  Respondent rebuts that petitioner is liable for the accuracy-related penalty because it distributed money to Beiner as compensation without any regard to the value of his services and without any formal compensation plan.

We agree with petitioner that it is not liable for the accuracy-related penalty.  That penalty does not apply to an underpayment to the extent that the taxpayer exercised ordinary business care and prudence as to the underpayment.  Sec. 6664(c); secs. 1.6662-3(a), 1.6664-4(a), Income Tax Regs.; see also United States v. Boyle, 469 U.S. 241 (1985).  The record persuades us that petitioner exercised ordinary business care and prudence as to its deduction of the unreasonable compensation of $180,260.  Beiner, on behalf of petitioner, met with Gallardo each December to set the bonus that petitioner paid to Beiner during that year, and petitioner generally ascertained that bonus by taking into account certain factors including Beiner's work during the year.

_____

[8] Pursuant to sec. 7491(c), the Commissioner bears the burden of production in this Court "with respect to the liability of any individual for any [accuracy-related] penalty" under sec. 6662(a).  Because petitioner is not an individual, that section has no applicability here.

The compensation paid to Beiner also left enough of petitioner's profits for that year in petitioner's equity so as to constitute a meaningful return to a hypothetical inactive independent investor.  We hold that petitioner is not liable for the accuracy-related penalty determined by respondent as to the $180,260 of disallowed compensation for 1999.

---

All arguments have been considered, and those arguments not discussed herein are without merit.

Decision will be entered under Rule 155.